WALTER W. GARRITY *v.* JOHN L. RADEL, JR., ET AL.

KING, C. J., SHEA, ALCORN, COMLEY and PALMER, Js.

350

Argued December 3, 1963—decided January 28, 1964

*Lorin W. Willis,* for the appellant (plaintiff).

*Edward J. McCarthy,* for the appellees (named defendant et al.).

*Daniel D. McDonald,* for the appellees (defendant Lindquist et al.).

KING, C. J.  The plaintiff, Walter W. Garrity, owner of fifteen shares of the capital stock of The

Andrew Radel Oyster Company, a Connecticut corporation, and the eight defendants, who, in varying amounts, individually owned the remaining outstanding eighty-five shares in the company, entered into a written agreement on December 17, 1959. Under this agreement, the defendants gave the plaintiff what purported to be an irrevocable proxy for a ten-year period.[1] It was also provided therein that "[t]his agreement shall, after the death or the retirement from the Corporation of one or more Stockholders, continue in full force and effect as to the others, but it may be terminated or altered *at any time* by the consent in writing of the *then* holders of four-fifths of the outstanding stock (excluding, however, any stock held by the Corporation) . . . ." (Italics added.)

As of the date of trial, no one of the defendants had died or retired. They had, however, as owners of 85 percent of the company's stock, unanimously consented in writing to a termination of the agreement between them and the plaintiff. It is the contention of the plaintiff that under the paragraph quoted above, the agreement could be terminated only after the death or retirement from the corporation of one or more of the stockholders, and he seeks a permanent injunction restraining the defendants from voting their shares until at least one of those contingencies occurs. This construction can be supported only if the word *"then"* has reference to the happening of one or both of the contingencies of death or retirement. But if *"then"* refers back to the phrase *"at any time"*, as claimed by the defendants, then four-fifths of the shareholders could terminate the agreement at their pleasure, and

---

[1] See General Statutes (Rev. to 1962) §§ 33-336—33-339, effective after the date of the above agreement, and therefore not affecting it.

if this were so, the action of the defendants would be valid.

The court, after considering all of the provisions of the agreement, concluded that the word *"then"* referred back to the next preceding adverbial phrase *"at any time"* and that death or retirement of a party was not a condition precedent to the right of the defendant stockholders to terminate the agreement.

An agreement must be viewed as a whole; *Sturtevant* v. *Sturtevant,* 146 Conn. 644, 648, 153 A.2d 828; and one which purports absolutely to disenfranchise stockholders is not ordinarily looked upon with favor. See *Shepaug Voting Trust Cases,* 60 Conn. 553, 579, 24 A. 32; Ballantine, Corporations (Rev. Ed.) §§ 179, 184; 5 Fletcher, Corporations (Perm. Ed., 1952 Rev.) § 2062. The court's interpretation was in harmony with this principle, was wholly reasonable and was correct. This is true even without regard to other considerations which might also render the proxy agreement revocable. There was no error in the court's denial of the injunction sought in the first count.

In the second count of his complaint, the plaintiff seeks to have enjoined (1) the purchase, by the corporation, of forty shares owned by five of the defendant stockholders and (2) the pledging of some of the corporation's assets as security for that purchase. Certain of the stockholders entered into an agreement on December 5, 1962, wherein the named defendant promised to cause the corporation to purchase the forty shares of stock from the five defendant stockholders at $3500 per share, a total cost to the corporation of $140,000, payable over a period of six years.

The plaintiff claims that the proposed purchase is

in violation of General Statutes (Rev. to 1962) § 33-358. That section authorizes the purchase by a corporation of its own stock, subject to certain restrictions. One restriction is that if the purchase is for cash or property, it may be made only to the extent of unreserved or unrestricted earned surplus, and another restriction is that no purchase or payment shall be made when the corporation is insolvent or when the purchase or payment would make it insolvent.[2] See note, 47 A.L.R.2d 758. The plaintiff makes no claim that there is an insufficient unreserved or unrestricted earned surplus, and at the trial he stipulated that he made no claim of present insolvency or that by entering into the contemplated contract for the purchase of its stock the corporation would be rendered insolvent. The plaintiff seems to claim that the transaction was in violation of the statute because payment was to be made in stated instalments extending over a period of about six years and consequently the transaction was not a purchase for cash or property.

The short answer to this claim is that there is nothing in § 33-358 which prohibits a corporation from purchasing its own stock on credit or which requires it to make the purchase for cash or property. The plaintiff has shown no facts which would bring the proposed purchase into conflict with any of the restrictions enumerated in § 33-358, even if all of those restrictions are applicable to a credit transaction such as we have here. The plaintiff's claim that the transaction, because it would involve deferred payments and a pledge of corporate assets, would violate the statute is without merit.

---

[2] "A corporation is 'insolvent' if it is unable to pay its debts as they become due in the usual course of business or it has liabilities in excess of assets." General Statutes (Rev. to 1962) § 33-284 (k).

The plaintiff also contends that the purchase agreement gave to the sellers a preferred claim on the company's assets which was superior to that of the plaintiff. This contention amounts to a claim that it is always improper to change the position of a stockholder to that of a creditor by an agreement for the purchase of his stock by the corporation. Since the transaction is authorized by the statute, this claim is without merit.

The plaintiff's final claim is that the purchase was not in the best interests of the company or of the plaintiff. In the summer or early fall of 1962, the plaintiff himself offered to sell to the corporation, on a credit basis, his fifteen shares at a price of $6000 per share. Quite naturally, he makes no claim that the corporation is paying more than the present fair value of its stock. There may indeed be abuses or inequities present in the purchase by a corporation of its own shares which would warrant an exercise of equitable powers of intervention, even though statutory provisions have, on their face at least, been complied with. See Ballantine, op. cit. § 257; 6A Fletcher, op. cit. (Perm. Ed., 1950 Rev.) § 2854; cf. *Buck* v. *Ross,* 68 Conn. 29, 32, 35 A. 763. But the plaintiff has not shown any such abuses or inequities here, and consequently the court did not err in declining to grant the injunction sought under the second count.[3]

There is no error.

In this opinion the other judges concurred.

[3] It may be pointed out that on the record it would appear that the corporation had not as yet agreed to purchase any shares. The agreement between Radel and the other defendant sellers provided that the corporation would be caused to pay the first instalment on the purchase price on December 24, 1962. Since this date has passed, a new agreement, or a modification of the old one in this respect, would appear to be required.