Edward J. McCARTHY and Lora R. McCarthy, Plaintiffs,

v.

Joseph J. CONLEY, Jr., District Director of Internal Revenue for the District of Connecticut, Defendant.

No. 9288.

United States District Court
D. Connecticut.

Feb. 26, 1964.

Edward J. McCarthy, McCarthy & Saur, Bridgeport, Conn., for plaintiffs.

Thomas F. Field, Dept. of Justice, Washington, D. C., Robert C. Zampano, U. S. Atty., New Haven, Conn., for defendant.

CLARIE, District Judge.

This action is brought pursuant to 28 U.S.C. §§ 1340 and 1346, against the District Director of Internal Revenue for a tax refund of $23,909.71 and interest. The claim arises out of deficiency assessments paid by the plaintiffs for the calendar years 1954, 1955, and 1956. Both parties have brought cross-motions for summary judgment as provided in Rule 56, Fed.R.Civ.P. After considering all of the pleadings, depositions, affidavits and all other papers filed by the parties, and having heard oral argument for the respective parties, the Court is of the opinion that the plaintiffs' motion for summary judgment should be denied and that the defendant's motion for summary judgment should be granted.

The plaintiff taxpayers, Edward J. and Lora R. McCarthy, are husband and wife,[1] and the latter is a daughter of Andrew Radel, Sr., the founder of The Andrew Radel Oyster Company.[2] Said Company was organized by Andrew Radel, Sr., in the year 1903 and has been in continuous existence ever since.[3] The Company had only one class of common stock,[4] 5,000 shares of which were outstanding during the period here in controversy.[5] There was no preferred stock.[6]

Mrs. Lora R. McCarthy acquired 1,000 shares of the common stock of The Andrew Radel Oyster Company in part from

---

1. McCarthy Deposition p. 5.
2. McCarthy Deposition pp. 13, 16.
3. McCarthy Deposition p. 16; Radel Deposition p. 53.
4. Garrity Deposition p. 21.
5. Complaint par. 10; Substituted Answer par. 10(a).
6. Garrity Deposition p. 21; Radel Deposition p. 63.

her father's estate after his death in 1915, and the remainder from her mother's estate after Mrs. Radel's death in 1931. Her two brothers and two sisters also owned 1,000 shares each of the capital stock of the Company.[7] No stock in the Company was owned outside Mrs. McCarthy's immediate family until the year 1959.[8]

On December 7, 1954, the board of directors of The Andrew Radel Oyster Company voted to purchase the 1,000 shares of stock belonging to Mrs. McCarthy at a price of $128.50 per share.[9] It is her claim that the cost basis of this stock was $361,250., and that, as a consequence, her sale of stock to the Oyster Company resulted in a loss to her of $234,750.20.[10]

Since the late 1930's the oyster industry has been beset by a number of difficult problems. The hurricane of 1938 covered many oysters with mud, destroying them.[11] In addition it washed many oysters from beds belonging to one company to beds belonging to other companies.[12] The acute shortage of labor during World War II, together with a shortening of working hours and an increase in wages added to the industry's problems.[13] In addition to the foregoing conditions, good oyster sets (a growth of baby oysters) tended to become less frequent.[14]

After the death of Andrew Radel, Sr. in 1915, his two sons, Andrew Radel, Jr. and J. Louis Radel, took over the operation of the firm; the former as President and Treasurer and the latter as Vice-President and Assistant Treasurer.[15] Subsequent to the death of their mother in 1931, these two sons, together with their three sisters, Margaret McElroy, Mary R. Keating, and Lora R. McCarthy, each owned one-fifth of the outstanding stock of the Company.[16] However, Andrew Radel, Jr. and J. Louis Radel continued to operate the Company without direct assistance or participation by their sisters.[17]

The operations of the Company during the late 1920's and the 1930's were profitable, and a considerable portion of the earnings in that period were retained in the Company.[18] These earnings were invested in marketable securities.[19] One purpose of this accumulation of earnings was to provide a reserve to tide the Oyster Company over the bad years which are inevitable in the oyster industry.[20] " In time, the Company acquired a "huge accumulation of negotiable securities.[21] " By 1951, the marketable securities in this account were worth "well over half a million dollars" and the income from that account was a very important factor in the finances of the Oyster Company.[22] The importance of the income from these securities can best be

7. Complaint par. 10; Substituted Answer par. 10(a).

8. McCarthy Deposition pp. 15, 16.

9. Garrity Deposition Sheet 1.

10. Complaint par. 10.

11. Radel Deposition p. 7.

12. Radel Deposition pp. 7–8.

13. Radel Deposition pp. 11–15.

14. Radel Deposition p. 24.

15. Radel Deposition pp. 4–6.

16. Complaint par. 10; Substituted Answer par. 10(a); Radel Deposition pp. 48–9.

17. McCarthy Deposition pp. 22–23; Radel Deposition pp. 5–6.

18. McCarthy Deposition p. 45; Radel Deposition pp. 56–57.

19. McCarthy Deposition p. 45; Radel Deposition p. 58.

20. Radel Deposition p. 56.

21. McCarthy Deposition p. 51.

22. McCarthy Deposition p. 51.

judged in terms of the profit and loss figures shown in Table I. below, which covers the years closest to those in controversy.[23]

## TABLE I

### ANDREW RADEL OYSTER CO.

### PROFITS AND LOSSES 1948–1960

| Year | Profit or (Loss) from Operations | Profit or (Loss) from Investments | Net Profit or (Loss) |
|------|------|------|------|
| 1948 | ($ 22,158) | $ 14,068 | ($ 8,090) |
| 1949 | ($ 37,017) | $ 6,435 | ($ 30,582) |
| 1950 | $ 1,984 | $ 22,428 | $ 24,412 |
| 1951 | $ 7,953 | $ 19,668 | $ 27,621 |
| 1952 | ($ 30,914) | $ 53,179 | $ 22,265 |
| 1953 | ($ 15,924) | $ 35,806 | $ 19,882 |
| 1954 | ($ 51,290) | $ 35,205 | ($ 16,085) |
| 1955 | ($ 1,016) | $ 21,554 | $ 20,538 |
| 1956 | ($ 52,799) | $ 81,757 | $ 28,958 |
| 1957 | ($ 83,399) | $ 64,616 | ($ 18,783) |
| 1958 | ($ 95,304) | $ 75,198 | ($ 20,106) |
| 1959 | ($146,135) | $ 97,537 | ($ 48,598) |
| 1960 | $140,850 | $ 2,920 | $143,770 |
| Totals | ($385,169) | $530,371 | $145,202 |

In the late 1940's and early 50's, the plaintiff, Mr. McCarthy, an attorney, became concerned about the size of the estate tax which would have to be paid, if his wife was still the owner of 1,000 shares of stock in the Oyster Company at the time of her death.[24] In addition, he was naturally concerned about the operating losses which the Company was currently incurring.[25] 1950, the Company reduced its annual dividend from $5.00 per share to $2.50.[26] Consequently, he approached the officers of the Company in late 1951 to see whether or not they would buy out his wife's stock. These meetings culminated in discussions in December 1951 regarding the purchase of Mrs. McCarthy's stock.[27] However, no decision of any sort regarding such a purchase was made at that time, and Mr. McCarthy concluded that the officers of the corporation, Andrew and J. Louis Radel, did not wish to continue the discussions any longer.[28] The corporate officers never made any attempt to go back to those discussions of December 1951, and Mr. McCarthy considered the matter dropped.[29]

On June 29, 1954, Mr. McCarthy heard through his wife's nephew, James McElroy, that Andrew and J. Louis Radel would be willing once again to resume discussions about the Company's stock situation.[30] This was the first time since December 1951, that Mr. McCarthy felt that there was any purpose in continuing the discussions regarding the possible sale of Mrs. McCarthy's stock to the Oyster Company.[31]

23. Garrity Deposition pp. 7–9.
24. McCarthy Deposition pp. 50–51.
25. McCarthy Deposition p. 52.
26. Radel Affidavit par. 13.
27. Complaint Exhibit "A" pp. 2–4.
28. McCarthy Deposition p. 49.
29. McCarthy Deposition p. 50.
30. McCarthy Deposition p. 53.
31. McCarthy Deposition p. 53.

Discussions continued during July of 1954 and in the latter part of that month, the Company made an offer to purchase the stock belonging to Mrs. McCarthy (1,000 shares), Mrs. Keating (799 shares) and Mrs. McElroy (865 shares) for $128.50 per share; Mrs. McCarthy and Mrs. Keating decided to accept.[32] In making the above offer, management intended to place itself in a position to obtain majority operating control and a two-thirds (⅔) majority for liquidating purposes.[33] The purchase price of said stock was based on the value of the quick assets of the firm (including its negotiable securities) less the value of its inventory of oysters, and its current liabilities.[34]

In December 1954, a special meeting of the stockholders of the Company was held in order to approve the plan for the purchase, cancellation, and redemption of Mrs. McCarthy's stock and the stock of some other stockholders.[35] This plan was approved and the board of directors thereupon directed the president of the Company to purchase this stock at a price of $128.50 per share.[36]

The cash to purchase Mrs. McCarthy's stock was raised by the sale of some of the negotiable securities which the Company had purchased with the profits, which it had made and accumulated in the 1920's and 30's.[37]

As outlined in the plaintiffs' claim for refund attached to the complaint, Mrs. McCarthy forwarded her certificates for 1,000 shares of stock to the Oyster Company on December 2, 1954 and she received $128,500. for her stock on December 8, 1954.[38] This stock was placed in the Oyster Company's treasury and was subsequently cancelled.[39] On the consummation of these transactions management controlled 68% of the outstanding stock from 1954 and until 1959.[40]

The claim for refund to which reference was just made, states that in the period subsequent to the repurchase of stock from Mrs. McCarthy in December 1954, The Andrew Radel Oyster Company had been limiting the scope of its operations and disposing of its unneeded assets. The principal assets so disposed of were the oyster lands and the processing plant in the Greenport-Peconic Bay area on Long Island.[41] They were disposed of in 1958 shortly after the death of Andrew Radel, Jr. who had acted as President of the Company until the time of his death.[42]

Several boats were also disposed of.[43] Table 2, hereinafter set forth, identifies the twelve boats which were operated by the Oyster Company in 1945, and the eight boats which remained as of the beginning of the year 1958.[44] The boats shown in the table are divided into three categories, oyster boats, star boats and watch boats. Oyster boats are used to transplant and harvest oysters; star boats are used to catch and kill starfish and watch boats are used to keep poachers off oyster lands.[45] Watch boats have become less important in recent years because of a decrease in the number of

---

32. McCarthy Deposition pp. 55–56.

33. Radel Affidavit par. 20.

34. Garrity Deposition p. 19.

35. Garrity Deposition Exhibit 1.

36. Garrity Deposition Exhibit 2.

37. McCarthy Deposition pp. 61–62; Radel Deposition p. 59; Garrity Deposition pp. 19–20.

38. Complaint Exhibit "A" pp. 5–6.

39. McCarthy Deposition p. 67; Garrity Deposition p. 22.

40. Radel Affidavit par. 23.

41. Complaint Exhibit "A" pp. 6–7.

42. Radel Deposition p. 37.

43. Complaint Exhibit "A" p. 6.

44. Radel Deposition pp. 41–47.

45. Radel Deposition pp. 28–30.

poachers.[46] Star boats have been supplanted to some extent by oyster boats which have been equipped to kill starfish, as well as to harvest oysters.[47]

## TABLE 2

Boats in Andrew Radel Oyster Company Fleet

| Year | Oyster Boats | Star Boats | Watch Boats |
|------|--------------|------------|-------------|
| 1945 | Lora | Star | Vigil |
|      | Sarah B | Argus | Aroco |
|      | Alice |  | Daisy |
|      | Medea |  |  |
|      | Louis, Jr. |  |  |
|      | James B. |  |  |
|      | Earle |  |  |
| 1958 | Lora | Star | Vigil |
|      | Sarah B |  | Aroco |
|      | Alice |  |  |
|      | Medea |  |  |
|      | Louis, Jr. |  |  |

It is thus indicated that the Oyster Company sold two oyster boats, one star boat and one watch boat during the period between 1945 and 1958; the exact dates these boats sold are not clear, nor would it be essential or material under the circumstances. The claim for refund attached to the complaint states that their sales occurred in the years 1956, 1957 and 1958.[48] The deposition of J. Louis Radel indicates (pp. 41–47) that some of these sales may have occurred as early as 1950. In any event, it is clear that these sales did not generate any of the funds distributed to Mrs. McCarthy in payment for her 1,000 shares of stock in The Andrew Radel Oyster Company.[49]

By 1959 the capital account of the Company was finally reduced from $500,-000., composed originally of 5,000 shares at $100.00 par value to 100 shares of the par value of $100.00 or an amount of $10,000.[50]

Despite all the adversities which it has encountered, The Andrew Radel Oyster Company is still in existence[51] and is still conducting oystering operations.[52] The Company has not been liquidated.[53] See Garrity v. Radel, Jr., et al., Conn., 197 A.2d 775 (1964).

The taxpayers' refund claim, plaintiffs' "Exhibit A" attached to the complaint, erroneously alleges that it was being filed pursuant to the provisions of the 1939 Internal Revenue Code; however, the plaintiffs' brief in this action, (p. 3) concedes that the law governing the transaction in dispute is the Code of 1954 and the Government concurs in this latter admission. This Court has jurisdiction of the action by virtue of 28 U.S.C. §§ 1340 and 1346.

All stock owned by the plaintiff, Lora R. McCarthy, in The Andrew Radel Oyster Company was purchased by a vote of the corporate stockholders and

46. Radel Deposition pp. 30, 31, 46.

47. Radel Deposition p. 46.

48. Complaint Exhibit "A" p. 6.

49. McCarthy Deposition pp. 61–62; Radel Deposition pp. 59–60; Garrity Deposition pp. 19–34.

50. Radel Affidavit par. 36.

51. Radel Deposition p. 53.

52. McCarthy Deposition p. 63.

53. Radel Deposition p. 53.

directors on December 7, 1954, and the shares were immediately cancelled. The Government and the plaintiffs both agree that this purchase and transfer constituted a redemption of her total stock interest in the corporation pursuant to Int.Rev.Code of 1954, § 317(b) [54] and was not in violation of § 318 of the Code.[55] The proceeds of the sale distributed to her were not subject to a tax as ordinary income, and thus was not classed as a taxable dividend.[56]

The proceeds from this sale, $128,500. were received by the taxpayer, Lora R. McCarthy and claimed by her to have resulted in a personal net loss of $232,-750.20. It is her representation that the total appraised value of said stock in the estates of her father and mother, from whom she inherited them, was $361,-250.20. She believes that she is legally entitled to carry forward for a period of five years said loss, and credit it against any capital gains on sales of property, in the joint returns of her and her husband for the years 1954, 1955, and 1956.

Under ordinary circumstances, no problem would arise, which would interfere with this sequence of events. But in this instance, Lora R. McCarthy was the sister of Andrew Radel, Jr., record owner of 1,000 shares; J. Louis Radel, owner of 1,000 shares; Mary R. Keating, owner of 799 shares and Margaret R. McElroy, owner of 865 shares. Together, at the time of the sale, they were the record owners of 3,664 common shares, out of a total of 5,000 shares outstanding. The Government contends that Lora R. McCarthy must be considered as constructively owning 3,664 shares of stock in said corporation at the time she sold her personally owned shares to that corporation. In other words, she engaged in a transaction between herself and a corporation, in which more than fifty percent of the outstanding stock was in-

---

54. § 317(b). "Redemption of Stock.—For purposes of this part, stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, whether or not the stock so acquired is cancelled, retired, or held as treasury stock."

55. § 318. "Constructive ownership of stock "(a) General rule.—For purposes of those provisions of this subchapter (subchapter B, Effects on corporations) to which rules contained in this section are expressly made applicable—
"(1) Members of family.—
"(A) In general.—An individual shall be considered as owning the stock owned, directly or indirectly, by or for—
"(i) his spouse * * *
"(ii) his children, grandchildren, and parents."

56. § 302. "Distributions in redemption of stock
"(a) General rule.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.
"(b) (1) * * *
"(2) * * *
"(3) Termination of shareholder's interest.—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.
"(4) * * *
"(5) * * *
"(c) Constructive ownership of stock.—
"(1) In general.—Except as provided in paragraph (2) of this subsection, section 318(a) shall apply in determining the ownership of stock for purposes of this section.
"(2) For determining termination of interest.—
"(A) In the case of a distribution described in subsection (b) (3), section 318(a) (1) shall not apply if—
"(i) immediately after the distribution the distributee has no interest in the corporation (including an interest as officer, director, or employee), other than an interest as a creditor,
"(ii) the distributee does not acquire any such interest (other than stock acquired by bequest or inheritance) within 10 years from the date of such distribution, and
"(iii) the distributee, at such time and in such manner as the Secretary or his delegate by regulations prescribes, files an agreement to notify the Secretary or his delegate of any acquisition described in clause (ii) and to retain such records as may be necessary for the application of this paragraph."

directly owned by herself pursuant to § 267. For this reason, the Government claims that Int.Rev.Code of 1954, § 267(a) [57] squarely prohibits the deduction of any capital losses by the plaintiff, Lora R. McCarthy, on the aforesaid sale of stock to the corporation unless it can be shown that these losses occurred in connection with a distribution in corporate liquidation or partial liquidation.

The substance of the dispute, therefore, centers around the question of whether or not the money paid to Mrs. McCarthy for the redemption of her stock was in fact a distribution in partial liquidation of the Oyster Company pursuant to § 346(a) (2).[58] It is not sufficient for the Government to establish that the transaction was a redemption in full payment for the stock, because § 346(a) (2) provides that certain redemptions may be not only redemptions, but also may be a distribution in partial liquidation of a corporation, if it meets certain basic requisites.

It is the plaintiffs' claim that the facts in this case satisfy the three requisites which are: (1) that the distribution is not essentially equivalent to a dividend; (2) that it is in redemption of part of the stock pursuant to a plan; and (3) that it occurs within the taxable year in which the plan is adopted or within the succeeding taxable year. The first requirement is conceded by the Government to have been satisfied, thus the Court will consider only the remaining two. Was the redemption pursuant to a plan and, if so, did it occur within the time allowed?

The record is very clear that no formal resolution was ever adopted by the stockholders or directors, authorizing or stating a plan or proposal to liquidate wholly or partially. Notwithstanding this absence of a formal plan, the Court must consider whether or not any informal plan did exist as a matter of fact.

"The Tax Court acknowledged that 'the distribution, to qualify under Sections 346(a) (1) or (2), must be made pursuant to a plan' but found no statement in the code or regula-

57. § 267. "Losses * * * with respect to transactions between related taxpayers

"(a) Deductions disallowed.—No deduction shall be allowed—

"(1) Losses.—In respect of losses from sales or exchanges of property (other than losses in cases of distributions in corporate liquidations), directly or indirectly, between persons specified within any one of the paragraphs of subsection (b).

"(2) * * *

"(b) Relationships.—The persons referred to in subsection (a) are:

"(1) Members of a family, as defined in subsection (c) (4);

"(2) – (9) * * *

"(c) Constructive ownership of stock. —For purposes of determining, in applying subsection (b), the ownership of stock—

"(1) * * *

"(2) An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family;

"(3) * * *

"(4) The family of an individual shall include only his brothers and sisters (* * *), spouse, ancestors, and lineal descendants;

"(5) * * *." (Emphasis added).

58. § 346. "Partial liquidation defined

"(a) In general.—For purposes of this subchapter, a distribution shall be treated as in partial liquidation of a corporation if—

"(1) * * *

"(2) the distribution is not essentially equivalent to a dividend, is in redemption of a part of the stock of the corporation pursuant to a plan, and occurs within the taxable year in which the plan is adopted or within the succeeding taxable year, including (but not limited to) a distribution which meets the requirements of subsection (b). * * *

"(b) * * *

"(c) Treatment of certain redemptions.—The fact that, with respect to a shareholder, a distribution qualifies under section 302(a) (relating to redemptions treated as distributions in part of full payment in exchange for stock) by reason of section 302(b) shall not be taken into account in determining whether the distribution, with respect to such shareholder, is also a distribution in partial liquidation of the corporation."

tions that the plan must be one so denominated in a formal resolution of the stockholders. Accordingly, the court held that a 'plan' has been established if the taxpayer has adopted formally or informally 'a plan which as a matter of fact shows itself to constitute a plan of complete liquidation or redemption of a part of the stock. * * *'" Fowler Hosiery Company, Inc. v. Commissioner of Internal Revenue, 301 F.2d 394, 397 (7th Cir. 1962).

■ Any "plan" to partially liquidate connotes among other factors, an intent, scheme or design contrived to partially liquidate the corporate business. This intent must precede the occurrence of the liquidation, otherwise it most certainly could not be considered a plan. Thus the existence or non-existence of a plan to liquidate part of the corporation, becomes an issue of fact to be determined by this Court.

"Whether a dividend is a 'distribution in liquidation' is a question of fact, and depends upon the intent of the directors of the corporation." Tate v. Commissioner of Internal Revenue, 97 F.2d 658, 660 (8th Cir. 1938).

The plaintiffs focus their presentation around the affidavit of J. Louis Radel which states:

"In making the above offer, management intended to place itself in a position to obtain majority operating control, and a two-third's majority for liquidating purposes." (par. 20).

"On the consummation of these transactions, management controlled 68% of the outstanding stock from 1954, and until 1959." (par. 23).

■ The petitioners' strongest argument to justify a plan attempts to meet the statutory requirement for liquidation or dissolution, but falls by the weight of its own error. The taxpayers' declared objective to acquire a two-thirds control is without legal substance, because at all times in the year 1954 to and including 1959 the statutory law of the State of Connecticut required a minimum of three-fourths (¾) vote of the outstanding stock for the granting of consent for the voluntary dissolution of a Connecticut corporation.[59] CONN.GEN.STAT. (REV.1949), § 5229.

" * * * If, at such meeting of the stockholders, three-fourths of the total number of shares of the issued and outstanding capital stock of each class vote to confirm such vote of the directors, the directors shall proceed forthwith to wind up the affairs of such corporation."

This law was effective at the time of the occurrence of this stock redemption, December 7, 1954 and continued in effect, until it was amended to provide for a two-thirds vote, in 1959, CONN.GEN. STAT. (REV.1958) § 33–376; this new amendment became effective January 1, 1961. CONN.P.A. No. 618, § 138 (Jan. Sess.1959). Thus, it is apparent that this claim is without foundation or validity.

On the contrary, the facts clearly disclose that conformance with the statutory requirement was never contemplated at the time of the redemption.

A. "We never actually drew up a plan. We merely expressed to one another the desire to do so and wished we could figure out some way. We never did figure out a way or have it. Otherwise I imagine we would have done it before he died." (March 8, 1958)

Q. "Did you ever have a plan, you and your brother and possibly Mr. Garrity, of acquiring a majority of the stock of the Radel Oyster Company for the management group?"

A. "There was never any plan. There might have been a desire on our part to have it."

Q. "Why would you have wanted to do that, sir?"

59. McCarthy Deposition p. 57; Hearing Transcript p. 41.

A. "Merely because to save any possible trouble because there were three girls and two fellows and if there is dissatisfaction it's nice to feel you have control. And certainly with the business going the way it was, it was natural to expect dissatisfaction." (Radel Dep. pp. 54, 58).

■ Management's only remaining declared purpose was the claimed intention to obtain majority operating control. While this is a desirable thing to have in the management of any corporate business, it is not a basis on which to found a partial liquidation. Majority control could have been accomplished by the brothers purchasing the stock directly from Lora R. McCarthy. Had this been done, it seems improbable that any claim would be advanced now that § 267 of the Code, involving related taxpayers, did not apply to any capital losses sustained yet substantially the same effect was accomplished here, unless the facts can substantiate a real contraction of the corporate business. Northup v. United States, 240 F.2d 304, 307 (2d Cir. 1957); Joseph Imler v. Commissioner, 11 T.C. 836 (1948).

■ When a portion of these negotiable securities held by the corporation were sold, to provide cash with which to purchase the stock of Lora R. McCarthy, what affect if any, did this have upon the Oyster Company at the corporate level? Did it cause a contraction of its operations in producing, harvesting, or selling oysters? The record discloses that it did not. Thus the requisites of § 346(a) (2) have not been satisfied.

"A contraction permitting capital gain treatment should be a radical event in the life of a corporation that is much more akin to a complete liquidation than to a dividend distribution. The distribution should:

"a) represent the consummation of a plan to reduce substantially the business activity of the corporation; and

"b) consists of sales, or the proceeds of their sale, previously committed to the active conduct of the corporate business and which accounted for at least 50% of the net worth of the corporation before the distribution. This 50% requirement is some protection against the uncertainties inherent in the 'reduction in business' concept."

"Excerpt from A.L.I., Income Tax Problems of Corporations and Shareholders, Report of Working Views of a Study by the A.L.I. Staff and A.B.A. Section of Taxation Liason Committee (1958), quoted in SURREY & WARREN, FEDERAL INCOME TAXATION 1275 (1960 Ed. with 1961 Supp.).

■ Every redemption of stock is not necessarily a partial liquidation of the corporate entity. Unless it is accomplished by a genuine contraction of the corporate working assets, it does not accomplish a partial constriction or liquidation of the corporation. The original accumulation of these securities, were earnings and profits set aside as a reserve between 1929 and 1936; and they were retained in their investment portfolio to grow to a market value approximating $500,000., in 1954. Counsel admitted to the Court [60] that these securities were not sold from time to time and plowed back into operations and other securities later reacquired to replace them in profitable years. Rather the fund was maintained almost intact as an investment "nest egg" in case of a hurricane or similar disaster.[61] It was never capitalized by the issuance of stock. The sale of part of these securities in this instance, so as to provide cash to purchase Lora R. McCarthy's stock was not a disposal or liquidation of the "working assets" of the corporation, but rather the distribution of a part of a reserve of earned surplus; thus the moneys derived therefrom did not effect a genuine corporate contraction of the business operations. The Senate Report on the 1954 Code states that "partial liquidation" primarily "involves the concept of 'corporate contraction' as de-

---

60. Hearing Transcript p. 38.

61. Radel Deposition p. 56.

veloped under existing law." [62] S.Rep. No.1622, 83d Cong., 2d Session; U.S. Code Cong. and Ad. News 1954, pp. 4621–4680, 4899.

A further factor to be considered is that this redemption was originally initiated and pressed by the plaintiff, Lora R. McCarthy and her sisters, continuously from 1951 through 1954 and was not primarily formulated to accomplish a corporate business purpose.

Q. "What, in substance, had been the thrust, the gist of the discussions in 1951, what was your objective during those discussions?"

A. "I had told Mrs. McCarthy for a long time that in the interests of our children if she should die, only the block of a thousand shares of the Radel Company, which would be appraised at what I considered a fantastic figure in this day, such as you might consider the figures in the father's and mother's estate, they would have a whopping estate tax to pay and the only way to pay it was from another liquid business, and she would leave nothing to the children from the Andrew Radel Oyster Company." (McCarthy Dep. pp. 50–51).

A. "Then I said, 'Your sisters, my wife, are still interested in getting out of the oyster company, and the oyster company is the only place that they can find any market for anybody to buy their stock in view of the condition of the oyster industry'; and was there any basis that they (J. Louis Radel and Andrew Radel) could consider upon which they would set the value of the price that they would give * * * for their shares of the stock * * *." (McCarthy Dep. p. 54).

A. "* * * I said that my wife is not interested in retaining the stock and would like to sell it, how much would you pay for it. And after several meetings over several years, that was the one and only offer I ever got. I was told that was the only offer." (McCarthy Dep. p. 40).

Q. "What did you want done in 1951, what was the gist of the discussion?"

A. "I wanted Mrs. McCarthy out if she could get out."

Q. "What did you want the company to do, if anything?"

A. "I wanted the company to buy her out if they could and would."

Q. "Was your objective in selling, if possible, did it remain the same during that period?"

A. "Always." (McCarthy Dep. pp. 51–52).

The decision of the corporation to redeem Lora R. McCarthy's stock in 1954 was motivated at the time by personal reasons of her own and not for the needs and purposes of the business. No

---

62. Treas.Reg. § 1.346.1 (1955)—Partial Liquidation.
(a) * * *.
"An example of a distribution which will qualify as a partial liquidation under subparagraph (2) of this paragraph and section 346(a) is a distribution resulting from a genuine contraction of the corporate business such as the distribution of unused insurance proceeds recovered as a result of a fire which destroyed part of the business causing a cessation of a part of its activities. On the other hand, the distribution of funds attributable to a reserve for an expansion program which has been abandoned does not qualify as a partial liquidation within the meaning of section 346(a). . . ."
Treas.Reg. § 1.346.2 (1955) Treatment of certain redemptions.
"If a distribution in a redemption of stock qualifies as a distribution in part or full payment in exchange for the stock under both section 302(a) and this section, then only this section shall be applicable. None of the limitations of section 302 shall be applicable to such redemption."

plan existed then or prior thereto to partially conclude or close out a part of this business. The decision to sell the securities did not represent a material contraction of the company's operations; and the company's ultimate contraction in 1958 and 1959 had no real relationship to the partial conversion of the securities and the use of the proceeds thereof to purchase the redeemed stock. See Edward L. Kraus, Jr. Trust, 6 T.C. 105 (1946).

■ Both parties have filed cross motions for summary judgment. In this case there are no material factual issues in controversy on which there is the slightest doubt.

> "If, on such disclosures, it appears that only one verdict could be rendered, that is, that there is no disputed issue of fact, it is then the duty of the judge to enter judgment in accordance with the showing made." Sartor et al. v. Arkansas Natural Gas Corp., 134 F.2d 433, 436 (5th Cir. 1943); See Doehler Metal Furniture Co. v. United States, 149 F.2d 130 (2d Cir. 1945).

The plaintiffs' motion for summary judgment is denied; and the defendant's motion for summary judgment is granted.