Donald L. MAINS and Joyce G. Mains, Plaintiffs,

v.

UNITED STATES of America, Defendant.

F. E. GOODING, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. Nos. 71–126, 71–127.

United States District Court, S. D. Ohio, E. D.

Jan. 15, 1974.

H. Thompson Nicholas, Jr., Cincinnati, Ohio, Bruce W. Powell, Powell, Powell & Weimer, Columbus, Ohio, for plaintiffs.

William W. Milligan, U. S. Atty., Columbus, Ohio, Roger P. Thomasch, Thomas R. Wechter, Tax Div., U. S. Dept. of Justice, Washington, D. C., for defendant.

## OPINION AND ORDER

KINNEARY, Chief Judge.

Plaintiffs in these consolidated actions seek refunds totaling $113,603.65 in federal income taxes for the year 1966 and statutory interest.

This matter is before the Court on the complaints filed by the plaintiffs Floyd Gooding, Donald L. Mains and Joyce G. Mains, the answer filed by the defendant and briefs of the parties.

This action was commenced under the provisions of Title 26, United States Code, Section 7422. The Court has jurisdiction over the subject matter of this action under the provisions of Title 28, United States Code, Section 1346. This matter was tried to the Court.

Plaintiffs contend that certain distributions received by them in 1966 as stockholders of the Gooding Amusement Company, Inc. and Thrills Unlimited, Inc. qualified as amounts received as the result of a partial liquidation pursuant to Section 346 of the Internal Revenue Code, and were therefore taxable at the capital gains rate. The government denied that the transactions in question qualified as partial liquidations and contends that the distributions were taxable as ordinary dividend income.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Plaintiff Floyd E. Gooding was the owner of 64.3 percent of the stock of the Gooding Amusement Company, Inc. He also owned 60 percent of the stock of Thrills Unlimited, Inc. In addition to being the controlling stockholder of both corporations, Gooding was also the chief operating officer of both corporations. Gooding died on August 14, 1972 and his estate has been substituted as a party to this action.

2. Plaintiff Joyce G. Mains is the daughter of Floyd Gooding. She owned 16.6 percent of the stock of Gooding Amusement and 35.7 percent of the stock of Thrills Unlimited during the tax year in question.

3. Gooding Amusement was engaged in the carnival business. The company was incorporated in 1946 but it had been operating as a partnership or proprietorship since the early 1930's. The company would contract with various fairs, expositions and shows to provide rides, entertainment and concessions. Each contract would provide for a specified playing date or dates at that particular event. The company had approximately 180 such contracts located primarily in the midwest.

4. For operational purposes, Gooding Amusemenet was divided into ten field units during the April to November carnival season. Each unit covered a designated route. A route consisted of a series of fairs or carnivals at which Gooding Amusement had obtained a contract.

This organizational arrangement enabled the company to operate at several different locations on the same day. The units were interchangeable in that personnel and equipment were transferred from unit to unit as the need arose and occasionally several units combined to play a large event.

5. While Gooding Amusement did have ten operational field units, all important management functions were performed at the headquarters of the company in Columbus, Ohio. This home office paid the privilege deposits[1] for each unit, bought most of the tickets and advertising for all of the units, kept the books of account and payroll records for all of the units, purchased all of the company equipment and negotiated most of the contracts. During the winter months all of the equipment from each of the units was stored in a common area. The expenses of repair and storage were not allocated to each unit. Finally, the company did not separately determine the profit or loss of each individual unit and it did not prorate its home office expenses among the ten units.

6. Thrills Unlimited was incorporated in 1957. The company was organized to hold title to some of the larger and therefore potentially more dangerous rides used by Gooding Amusement. Thrills would "book on" or lease these rides to Gooding Amusement in exchange for a percentage of the gross receipts received from their operation. The essential management operations of Thrills were performed at the company headquarters. Thrills did not keep separate records for each ride.

7. By far the most profitable of the ten operational units of Gooding Amusement was unit 3. This unit was referred to internally as the "Southern Route" and advertised as "Gooding's Million Dollar Midway." The Southern Route would commence operations in August in Pennsylvania and play at several large fairs located primarily in the south until the end of its season in early November. Prior to August, unit 3 would participate in playing several other dates consisting primarily of shopping centers and church bazaars that were part of other routes. The general manager, permanent employees and equipment of the Southern Route would join this unit in August.

8. Gooding Amusement first acquired contracts in the south in 1952 after it hired Hal Eifort as a general manager. Eifort brought with him several contracts in the south. Gooding provided Eifort with a nucleus of five rides which Eifort used on the Southern Route. Over the years other contracts were added to the original ones and some contracts were lost to competitors. However, in comparison to the other nine routes, the playing dates on the Southern Route remained more or less the same from year to year.

9. During the period August 1, 1965 through July 31, 1966 the Southern Route grossed $1,219,684.73, or 38.65 percent of Gooding Amusement's total gross income of $3,155,522.68. However, it also produced 47.91 percent of the company's expenses. The Southern Route had an average daily gross of $14,520.05 while the remaining routes had an average daily gross of $1,585.48. The Southern Route had only 84 playing days while the other nine routes had a total of 1221 playing days.

10. The degree of independence enjoyed by the Southern Route prior to 1966 is disputed by the parties.[2] However, the Southern Route was insured under the same insurance policy as the rest of the company and all business records and profits were ultimately sent to the home office of Gooding Amusement. The Southern Route used the

---

1. The privilege deposit was a fee posted in advance by Gooding Amusement with the carnival or fair for the right to cover that particular event.

2. The conflicts in testimony involved in this dispute will be discussed more fully below.

Gooding Amusement bank account in Columbus. In addition, as noted above, Gooding Amusement did not keep separate records for any unit. Eifort did have almost complete control over the day to day operations of his unit while he was traveling his route. Apparently other route managers had similar control but, since most of the other routes were located in the midwest, Gooding took a much more active role in supervising their operations as compared to the operations of the Southern Route. Gooding also believed that Eifort was experienced enough to manage the route without active supervision.

11. Each route including the Southern Route had a small nucleus of rides and personnel. Gooding Amusement also had a small permanent management staff in Columbus. The remainder of the company employees were basically transients who were hired by each unit as the need arose. In addition, even though Gooding Amusement owned over one hundred rides divided among the ten units, each unit would frequently "book on" or lease other rides as the need arose.

12. The Southern Route apparently had more permanent employees than any of the other routes. In fact, many of these employees were employed during the off season by another corporation controlled by Gooding. However, this unit also hired temporary employees as the need arose or leased additional rides.

13. As noted above, rides and personnel were frequently shifted from unit to unit. However, the Southern Route had some large equipment that was used exclusively by it. In addition, the small permanent staff of the Southern Route apparently did not work with any other unit.

14. Gooding had a heart attack in 1964. As a result, Gooding decided to sell both Gooding Amusement and Thrills. On March 16, 1966 Gooding entered into an agreement to sell the Southern Route to a group headed by Milton Kaufman. On April 5, 1966 both Thrills and Gooding Amusement adopted plans of complete liquidation pursuant to Section 337 of the Internal Revenue Code. The next day, Gooding Amusement signed a contract to sell the Southern Route to Gooding's Million Dollar Midway, Inc., a Delaware corporation whose principal was Milton Kaufman, for $350,000.00.[3] At the same time, Thrills signed a contract to sell a "Mad Mouse" ride to the same corporation for $25,000.00. The "Mad Mouse" ride had never been used by the Southern Route prior to the sale. After the sale was completed, $363.632.66 was distributed to the shareholders of both corporations.

15. Eifort played a key role in arranging the sale. As part of the deal, he and the permanent staff of the Southern Route left Gooding Amusement to work for the new corporation. Gooding became Chairman of the Board of Directors of the new corporation.

16. The assets sold by Gooding Amusement represented only 5.19 percent of the total net worth of the company. The assets sold by Thrills represented only 1.41 percent of its total net worth. At the time of the sale, Gooding Amusement had undistributed profits or earned surplus of $1,335,000.00. However, during the year of the sale, the company paid cash dividends totalling only $8,540.00 to its shareholders in addition to the distribution made as a result of the sale. Similarly, Thrills had undistributed profits of $215,124.83 but paid dividends of only $2,100.00 to its shareholders in addition to the distribution made as a result of the sale.

17. The financial records of both corporations from the date of sale through 1971 do not reflect a redemption of stock by the shareholders arising out of the sale of the Southern Route and "Mad Mouse" ride. Rather, the financial records of both corporations indicate that the amount of the distribu-

3. This figure does not include a $36,300.00 reimbursement for privilege deposits pre-

viously made by Gooding Amusement for contracts on the Southern Route.

tion was charged against the earned surplus account and not the capital stock account. The financial records of Gooding Amusement for the year ending August 31, 1972 do indicate that a redemption took place in a prior year.

18. In addition to purchasing the Southern Route and Mad Mouse ride, the buyers were given an option to purchase the balance of both corporations within one year. This option was not exercised and, in fact, the buyers of the Southern Route regarded the rest of both corporations as a poor investment because of their low profit margins. Gooding Amusement and Thrills have continued to operate from the date of the sale and, to date, the remainder of both corporations have not been sold.[4]

19. After it became apparent that the buyers of the Southern Route had decided not to purchase the remainder of both corporations, the plans of complete liquidation for both corporations were amended to plans of partial liquidation.

20. In the year of the sale, Gooding Amusement purchased new equipment for an amount in excess of $100,000.00 while Thrills purchased new equipment worth approximately $57,000.00. In addition, Thrills purchased additional equipment worth approximately $92,-000.00 during the next two years. The Thrills purchases were made pursuant to a plan of expansion adopted prior to the date of the sale of the Mad Mouse ride.

### Discussion

A distribution of property to a stockholder by a corporation with respect to his stock must be treated as a dividend to the extent of the earnings and profits of the corporation. 26 U.S.C. §§ 301, 316. One exception to this general rule is Section 331. Under that section, amounts received by a stockholder as the result of a partial liquidation of a corporation are treated as the proceeds of a sale of his stock. Therefore, any gain

which the stockholder recognizes as a result of the distribution will be capital gain and not ordinary income if the stock was a capital asset in his hands.

The term partial liquidation is defined in Section 346:

(a) In general.—For purposes of this subchapter, a distribution shall be treated as in partial liquidation of a corporation if—

(1) the distribution is one of a series of distributions in redemption of all of the stock of the corporation pursuant to plan; or

(2) the distribution is not essentially equivalent to a dividend, is in redemption of a part of the stock of the corporation pursuant to a plan, and occurs within the taxable year in which the plan is adopted or within the succeeding taxable year, including (but not limited to) a distribution which meets the requirements of subsection (b).

. . . . . .

(b) Termination of a business.—A distribution shall be treated as a distribution described in subsection (a)(2) if the requirements of paragraphs (1) and (2) of this subsection are met.

(1) The distribution is attributable to the corporation's ceasing to conduct, or consists of the assets of, a trade or business which has been actively conducted throughout the 5-year period immediately before the distribution, which trade or business was not acquired by the corporation within such period in a transaction in which gain or loss was recognized in whole or in part.

(2) Immediately after the distribution the liquidating corporation is actively engaged in the conduct of a trade or business, which trade or business was actively conducted throughout the 5-year period ending

---

4. Currently, an unrelated corporation holds an option to purchase both Gooding Amusement and Thrills. To date, this option has not been exercised and it may never be exercised.

on the date of the distribution and was not acquired by the corporation within such period in a transaction in which gain or loss was recognized in whole or in part.

Whether or not a distribution meets the requirements of paragraphs (1) and (2) of this subsection shall be determined without regard to whether or not the distribution is pro rata with respect to all of the shareholders of the corporation.

(c) Treatment of certain redemptions. —The fact that, with respect to a shareholder, a distribution qualifies under section 302(a) (relating to redemptions treated as distributions in part or full payment in exchange for stock) by reason of section 302(b) shall not be taken into account in determining whether the distribution, with respect to such shareholder, is also a distribution in partial liquidation of the corporation. . . .

The only question which must be answered in this case is whether the sale of the Southern Route and Mad Mouse ride by Gooding Amusement and Thrills qualified as partial liquidations within the meaning of Section 346. The commissioner determined that the transaction did not qualify as a Section 346 partial liquidation. This determination is presumed to be correct and the taxpayer has the burden of proof to overcome the presumption.

I

A distribution qualifies as a partial liquidation under Section 346(a)(2) if it:

(1) "is not essentially equivalent to a dividend";

(2) is in redemption of a part of the stock of the corporation pursuant to a plan; and

(3) occurs within the taxable year in which the plan is adopted or within the succeeding tax year.

The second and third elements of this test are basically mechanical in that an examination of the corporate records will generally reveal whether or not the taxpayer has satisfied them. However, the question of whether a distribution is "not essentially equivalent to a dividend" is far more difficult to resolve. Unfortunately, neither the statute nor the regulations thereto define this phrase. The regulations to Section 346 state:

. . . An example of a distribution which will qualify as a partial liquidation under subparagraph (2) of this paragraph and section 346(a) is a distribution resulting from a genuine contraction of the corporate business such as the distribution of unused insurance proceeds recovered as a result of a fire which destroyed part of the business causing a cessation of a part of its activities. On the other hand, the distribution of funds attributable to a reserve for an expansion program which has been abandoned does not qualify as a partial liquidation within the meaning of section 346(a). . . . Treas.Reg. § 1.346.–1 (1955).

The concept of corporate contraction originated in cases decided under Section 115(g) of the Internal Revenue Code of 1939. Section 115(i) of the 1939 Code defined the term partial liquidation to include a distribution made by a corporation in complete cancellation or redemption of a part of its stock. Under Section 115(g)(1), any redemption of a part of the stock of a corporation which was not "essentially equivalent to the distribution of a taxable dividend" was treated as a partial liquidation. Some cases interpreting this language hold that if there was a genuine contraction in a corporation's business then that corporation could distribute in liquidation to its shareholders the assets no longer required by the corporation because of the contraction. *See, e. g.,* Sullivan v. Commissioner, 17 T.C. 1420 (1952), aff'd, 210 F.2d 607 (5th Cir. 1954); *see also* 1 Mertens, Law of Federal Income Taxation § 9.69. Another line of cases held that Section 115(g) was inapplicable where the stockholder's interest in the corporation was complete-

ly terminated or disproportionately reduced as a result of a distribution. *See, e. g.,* Johnson, Carvell & Murphy v. Riddell, 173 F.Supp. 214 (S.D.Calif.1959); *see also* 1 Mertens, Law of Federal Income Taxation § 9.69.

The primary problem with the concept of partial liquidation as it existed under the 1939 Code was that under Section 115 all distributions were treated the same regardless of whether they had an effect at the stockholder level or at the corporate level. The Senate Committee which studied the draft of the 1954 Code commented on the problems created by Section 115:

> . . . Existing law is complicated by the fact that stock redemptions are included within the terms of the partial liquidation provisions. Thus, a redemption of all of the stock of 1 of 2 sole shareholders of a corporation may result in capital-gain treatment to the redeemed shareholder. The result occurs, however, not by reason of the use of any particular assets of the corporation to effect the redemption but because the distribution when viewed at the shareholder level is so disproportionate with respect to the outstanding shareholder interests as not to be substantially equivalent to a dividend. . . . 3 U.S.Code Cong. & Admin.News, p. 4680 (1954).

Congress attempted to solve this problem by changing the definition of partial liquidation. A partial liquidation is now defined solely in terms of what happens at the corporate level.

Section 346(a) was added by the Senate to the House bill. The Senate Committee report on this section stated that:

> . . . Subsection (a) is intended to provide a definition of partial liquidation which replaces that contained in section 115(i) of the 1939 Code. Primarily, this definition involves the concept of "corporate contraction" as developed under existing law. A distribution shall be treated as in partial liquidation if it is one of a series in redemption of all of the stock of a corporation pursuant to a plan or if the distribution is not essentially equivalent to a dividend and is in redemption of a part of the stock of a corporation pursuant to a plan of partial liquidation and occurs within the taxable year in which the plan is adopted or within the succeeding taxable year.

> It is intended that a genuine contraction of the business as under present law will result in partial liquidation. See, for example, Joseph Imler (11 T. C. 836). However, a distribution of a reserve for expansion is not a partial liquidation. . . . 3 U.S.Code Cong. & Admin.News p. 4899 (1954).

Another section of the Senate Committee report gives an example of a case involving a corporate contraction:

> . . . The general language of the proposed draft would include within the definition of a partial liquidation the type of cases involving the contraction of the corporate business. Such as for example, cases which hold that if the entire floor of a factory is destroyed by fire, the insurance proceeds received may be distributed pro rata to the shareholders without the imposition of a tax at the rates applicable to the distribution of a dividend, if the corporation no longer continues its operations to the same extent maintained by the destroyed facility. Voluntary bona fide contraction of the corporate business may of course also qualify to the same extent as under existing law. . . . 3 U.S.Code Cong. & Admin.News, p. 4680 (1954).

 The legislative history of Section 346(a)(2) indicates that the most important factor to be considered in determining whether or not a transaction qualifies as a partial liquidation under 346(a)(2) "is whether there has been a contraction in the business of the corporation." Ballenger v. United States, 301 F.2d 192, 195 (4th Cir. 1962). However, this factor is not the only factor which must be examined since "many distributions which contract the size of

a corporation possess the major indicia of a dividend distribution . . . ." Taxation of Corporations and Sharehold-Bittker and Eustice, Federal Income ers § 9.52, p. 9–50 (3d. ed. 1971).

■ Therefore, after determining whether or not a corporate contraction has taken place, courts have also examined the following factors:

1. The net effect of the transaction.
2. The presence or absence of a bona fide corporate business purpose.
3. Whether the action was initiated by the stockholders or by the corporation.
4. The size of the corporate earned surplus.
5. The amounts, frequency and significance of the dividends paid by the corporation in the past.
6. Whether there were any special circumstances relating to the distribution.

See Imler v. Commissioner, 11 T.C. 836 (1948); Heman v. Commissioner, 283 F.2d 227 (8th Cir. 1960); United States v. Carey, 289 F.2d 531 (8th Cir. 1961).

Whether there has been a genuine corporate contraction depends upon the facts and circumstances of each case. The assets sold by Gooding Amusement represented only 5.19 percent of the net worth of the company while the assets sold by Thrills represented only 1.41 percent of its net worth. One court, citing an American Law Institute study, has held that a corporation must sell at least 50 percent of its net worth before a distribution of the proceeds of the sale to the stockholders could qualify under Section 346(a)(2). McCarthy v. Conley, 229 F.Supp. 517 (Conn.1964), aff'd. 341 F.2d 948 (2d Cir. 1965).

■ While the Court does not find it necessary in this case to adopt an arbitrary percentage test, the Court does believe that a corporation must sell a significant percentage of its net worth and distribute the proceeds of the sale to its stockholders before the transaction can qualify as a Section 346(a)(2) partial liquidation. The Court does not believe that 5.19 percent of Gooding Amusement's net worth and 1.41 percent of Thrills' net worth represented a significant percentage of either corporation's net worth. In addition, the Court notes that each corporation purchased a large amount of new equipment after the sale. The net result of these new purchases was that the value of both corporation's operating assets remained basically the same. See Rev.Rul. 67–299, 1967–2 Crim.Bull. 138. Finally, the Court does not believe that the sale of the Southern Route or the Mad Mouse ride substantially reduced the business activity of either corporation. While the Southern Route produced a substantial percentage of Gooding Amusement's gross income,[5] the number of contracts served by the Southern Route and the number of playing days it had were small when compared to the activities of the remaining nine units.

■■ A partial liquidation is more than a mere sale of assets by a corporation. The sale must be accompanied by a significant reduction in the corporation's net worth and by a substantial reduction in its business activities.[6] The presence of these factors may establish that a significant event in the life of the corporation has occurred as opposed to a mere sale of now unwanted assets. The Court concludes on the basis of this record that neither corporation genuinely contracted its business as a result of the sale of the Southern Route and Mad Mouse ride.

■■ At the time of the sale, both corporations had comparatively large amounts of accumulated earnings and

5. While the Southern Route produced a substantial percentage of the company's gross income, it also produced 47.91 percent of the company's expenses. Therefore, while other routes were not as profitable they were not as expensive to operate and in fact produced most of the company's net income.

6. Of course, what constitutes a substantial reduction depends upon the facts and circumstances of each case.

profits.[7] During past years, both corporations had paid extremely low dividends in comparison to their earnings. In addition, both companies were essentially closely held family corporations. Under these circumstances, a purported partial liquidation must be carefully examined to prevent tax avoidance. This is especially true where, as here, the distributions were pro rata and did not meaningfully reduce any stockholder's proportionate interest in either corporation. Cf. United States v. Davis, 397 U.S. 301, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970). The distributions in this case had the same practical effect as a dividend. In fact, for six years the distributions were treated as a dividend on the corporate records of both corporations. Those records indicate that the distributions were charged against the earned surplus account on both corporations' balance sheets. Under proper accounting procedures, the distributions should have been charged against the capital stock account to reflect the redemption of a portion of the stock. The company accountant who was also on the board of directors testified that the distributions should have been charged against the capital stock account but that a bookkeeping error was made that went unnoticed for six years. The Court finds it difficult to believe that any Certified Public Accountant could overlook such an obvious and fundamental mistake for six years. The Court believes that the distributions in this case were essentially equivalent to a dividend and were in fact treated as dividends on the corporate books. Therefore, the transaction does not qualify as a Section 346(a)(2) partial liquidation.

## II

Under Section 346(b), a transaction will qualify as a partial liquidation where:

1. Two or more active, separate businesses have been conducted for a minimum of five years.

2. The distribution to the stockholders is attributable to the corporation's ceasing to conduct one of those separate businesses.

3. Immediately after the distribution the corporation continues to conduct its other business or businesses.

This subsection has no counterpart in the 1939 Code. Its authors apparently accepted the corporate contraction test but were concerned about the vague standards applied by the courts. This subsection was therefore specifically drafted to define one situation in which capital gain or loss treatment would be assured. *See* Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders § 9.53, p. 9–55 (1971). The requirements of this subsection were carefully drawn to prevent tax avoidance.

Plaintiffs contend that the Southern Route and Mad Mouse ride were separate businesses from their respective corporations within the meaning of Section 346(b). The term "business" is defined as:

. . . a specific existing group of activities being carried on for the purpose of earning income or profit from only such group of activities, and the activities included in such group must include every operation which forms a part of, or a step in, the process of earning income or profit from such group. Such group of activities ordinarily must include the collection of income and the payment of expenses. It does not include—

. . . . . .

(3) A group of activities which, while a part of a business operated for profit, are not themselves independently producing income even though such activities would produce income with the addition of other activities or with large increases in activities previously

7. For example, Gooding Amusement's balance sheet for the year ended August 31, 1966 shows total assets of $1,942,462.30 and earned surplus of $1,364,453.03.

incidental or insubstantial. . . . Treas.Reg. § 1.355–1(c) (1955).[8]

The court initially notes that Gooding Amusement was engaged in the carnival business and that the Southern Route was merely one operational unit of the corporation. Plaintiffs, relying primarily on the testimony contained in the deposition of Hal Eifort, contend that the Southern Route operated completely independent of Gooding Amusement and was, therefore, a separate business. Eifort's testimony by itself somewhat supports plaintiffs' position. However, other testimony in the record indicates that Eifort's operations were merely part of the overall activities of the corporation. The company accountant testified that all essential management functions were performed at the home office of the company in Columbus. The home office paid all significant expenses, posted the privilege deposits for each unit and maintained all permanent records including all tax records. The company did not treat the Southern unit or any other unit as a separate business and commingled all receipts. The Southern Route was not separately insured. Eifort did have almost complete control over his own unit while it was traveling its route and even paid some of his own expenses. This arrangement was necessary simply because of the nature of the carnival business. Finally, the Court notes that during the off season all of the rides from each of the units were stored in a common area.[9]

 On the basis of this record, the Court does not believe that the Southern Route included every operation which formed a part of, or a step in, the process of earning income or profit. In addition, the Southern Route did not pay all of its own expenses and was not treated as a separate business on the corporate books. *See* Blaschka v. United States, 393 F.2d 983, 990–992, 184 Ct.Cl. 264 (1968).[10] The Court therefore concludes that the Southern Route was not a separate business within the meaning of Section 346(b).

The Mad Mouse ride was merely one of the rides owned by Thrills and leased to Gooding Amusement. All essential corporate records were kept by the company and the Mad Mouse ride was not treated as a separate business on these records. All essential management functions were performed at the company headquarters.

 The Mad Mouse ride was not used by the Southern Route prior to its sale. In fact, the record does not indicate where and by whom this ride was used during the years prior to its sale. The Court therefore concludes that the Mad Mouse ride was not a separate business within the meaning of Section 346(b).

### III

 In their post trial brief, plaintiffs contend that the transaction in question qualifies as a partial liquidation under the provisions of Section 346(a)(1). The government has filed a motion to strike this contention because this issue was never raised in plaintiffs' claims for refund, in the final pretrial order or at the trial itself.

8. The regulations to Section 346 state that the term "active conduct of a trade or business" is defined in the regulations to Section 355.

9. Eifort testified in his deposition that his equipment was kept in a special location during the off season. However, the company accountant specifically testified that each unit stored its equipment in a common place. This testimony is consistent with other testimony in the record and is more credible. The Court therefore believes that the equipment for the Southern Route was stored with all of the rest of the company equipment in a common area during the off season.

10. The *Blaschka* case also stressed the importance of the amount of income generated by the allegedly separate business. In this case, the Southern Route generated a substantial amount of income. However, this fact by itself is not necessarily determinative of the issue. Other factors such as who manages the allegedly separate business and who pays its expenses must also be carefully examined.

The final pretrial order lists the following issues of fact and law:

Whether the distributions in question qualify as partial liquidations under Section 346(a)(2) or Section 346(b) of the 1954 Internal Revenue Code.

In the case of Section 346(a)(2), qualification depends upon whether plaintiffs can establish that the distributions were "not essentially equivalent to a dividend."

In the case of Section 346(b) qualification depends upon whether plaintiffs can establish that the distributions were attributable to the termination of an "actively conducted . . . trade or business" within the meaning of that section.

The final pretrial order was prepared by counsel for the parties and approved by the Court. The statement of issues in the order does not mention Section 346(a)(1).

One of the purposes of a pretrial order is to narrow and define the issues in a case. The final pretrial order does not raise the question of whether the transaction qualified as a partial liquidation under Section 346(a)(1). Therefore, this issue, which has not been briefed by the government, is not properly before the Court.[11] Morrocco v. Northwest Engineering Company, 310 F.2d 809 (6th Cir. 1962). Cornish v. United States, 221 F.Supp. 658, 666 (Oregon 1963), rev'd on other grounds 348 F.2d 175 (9th Cir. 1965); Fleming v. Ayoud, 206 F.Supp. 860, 864 (D.C.1962), aff'd on other grounds 114 U.S.App.D.C. 301, 315 F.2d 47 (1963).

A careful examination of the trial transcript does not indicate that the government impliedly consented to place this issue in the case. In view of this conclusion, the Court finds it unnecessary to consider whether plaintiffs raised this issue in their claims for refund.

---

11. In any event, the sales in question would not qualify as a partial liquidation under Section 346(a)(1) in that there has been no

*Conclusions of Law*

1. The Court has jurisdiction over the subject matter of this action under the provisions of Title 28, United States Code, Section 1346(a)(1).

2. The sale of the Southern Route by Gooding Amusement was not a partial liquidation within the meaning of Section 346(a)(2) or Section 346(b).

3. The sale of the Mad Mouse ride by Thrills was not a partial liquidation within the meaning of Section 346(a)(2) or Section 346(b).

4. The distributions received by plaintiffs were properly taxed as ordinary income.

5. Plaintiffs may not raise an issue in their post trial brief not listed in the final pretrial order.

Whereupon, the Court determines that judgment should be and hereby is entered for the defendant, United States of America.

*series* of distributions in redemption of *all* of the stock of the two corporations.