# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 36916

| | |
|---|---|
| REED J. TAYLOR, a single person, | ) |
| | ) |
| Plaintiff/Counterdefendant/Appellant/ Cross-Respondent, | ) |
| | ) |
| v. | ) |
| | ) |
| AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation; R. JOHN TAYLOR and CONNIE TAYLOR, individually, and the community property comprised thereof; BRYAN FREEMAN, a single person; JOLEE DUCLOS, a single person; and JAMES BECK and CORRINE BECK, | ) |
| | ) |
| Defendants/Counterclaimants/ Respondents/Cross-Appellants, | ) |
| and | ) |
| CROP USA INSURANCE AGENCY, INC., an Idaho corporation, | ) |
| Defendant-Respondent, | ) |
| and | ) |
| 401(k) PROFIT SHARING PLAN FOR THE AIA SERVICES CORPORATION, | ) |
| Intervenor/Cross-Appellant. | ) |

Lewiston, May 2011 Term

2011 Opinion No. 97

Filed: September 7, 2011

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Second Judicial District, State of Idaho, Nez Perce County. Hon. Jeff M. Brudie, District Judge.

District court decision granting partial summary judgment and dismissing causes of action, affirmed.

Campbell, Bissell & Kirby, PLLC, Spokane, for appellant Reed J. Taylor. Roderick C. Bond argued.

1

Hawley, Troxell, Ennis & Hawley, Boise, for respondents AIA Services Corporation, AIA Insurance, Inc., and CropUSA Insurance Agency, Inc. D. John Ashby argued.

Quarles & Brady, LLP, Chicago, for respondent CropUSA Insurance Agency, Inc.

Risley Law office, PLLC, Lewiston, for respondents Connie Taylor, James Beck and Corrine Beck. David R. Risley argued.

Gittins Law Offices, Clarkston, for respondents JoLee Duclos and Bryan Freeman. David A. Gittins appeared.

Charles A. Brown, Lewiston, appeared for respondent 401(k) Profit Sharing Plan for the AIA Service Corporation.

R. John Taylor, Lewiston, pro se respondent.

---

.

BURDICK, Chief Justice

On July 12, 1995, AIA Services Corporation (AIA Services) entered into a Stock Redemption Agreement with Appellant Reed Taylor to purchase all of his shares (613,494 shares) in AIA Services for a $1.5 million down payment promissory note, a $6 million promissory note and other consideration. Reed Taylor is the founder of AIA Insurance, Inc. (AIA Insurance), which is a wholly-owned subsidiary of AIA Services, and at the time he negotiated the Stock Redemption Agreement, Reed Taylor was the majority shareholder of AIA Services. AIA Services failed to pay a $1.5 million note issued to Reed Taylor under the Stock Redemption Agreement when it became due on October 20, 1995. Reed Taylor and AIA Services agreed to modify the Stock Redemption Agreement and entered into the Stock Redemption Restructure Agreement, but thereafter, AIA Services failed to make certain payments that had become due under the new terms. On January 29, 2007, Reed Taylor filed suit against AIA Services, AIA Insurance and John Taylor, seeking to recover the amounts owed on the two promissory notes.

On June 17, 2009, the district court granted partial summary judgment in favor of Respondents and dismissed six of Reed Taylor's causes of action upon finding the Stock Redemption Agreement to be illegal and unenforceable under the 1995 version of I.C. § 30-1-6, which restricts a corporation to use only earned surplus and, under certain circumstances, capital

2

surplus when redeeming its shares. Reed Taylor appeals, arguing that the Stock Redemption Agreement complies with I.C. § 30-1-6 and that even if the Stock Redemption Agreement fails to comply with I.C. § 30-1-6, it is still enforceable under numerous theories. Reed Taylor also argues that the district court committed multiple errors in its proceedings. Respondents cross appeal, arguing that all causes of action in Reed Taylor's Complaint should be dismissed. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Reed Taylor is the founder of AIA Insurance, an insurance agency based in Lewiston, Idaho, which sells insurance products to farmers and members of various agricultural growers associations. Reed Taylor was the majority shareholder of AIA Services, a holding company which has wholly-owned AIA Insurance at all times relevant to this lawsuit. In 1995, he held 63 percent of approximately 973,000 outstanding shares of AIA Services common stock and served as the Chairman of the Board of Directors and the Chief Executive Officer of AIA Services.

AIA Services noticed a meeting of shareholders to be held on March 7, 1995, to consider various transactions, including exercising an option to purchase 500,000 of Reed Taylor's 613,494 shares of AIA Services common stock for $7.5 million. At the March 7, 1995 special meeting of shareholders, AIA Services shareholders approved the purchase of Reed Taylor's shares as well as other transactions. The shareholders were not provided information as to the source of funds from which Reed Taylor's shares would be purchased. The plan to redeem Reed Taylor's shares was not consummated because AIA Services failed to raise the necessary funds through the private placement of Series B Preferred Stock and Series C Preferred Stock and Warrants, which the board approved by resolution on January 12, 1995.

AIA Services sent a letter to its shareholders announcing that it could not proceed with the previously approved plan and announced a new plan for reorganization, which included redeeming all of Reed Taylor's AIA Services common stock for $7.5 million and other consideration, including airplanes and debt forgiveness. The letter sought shareholder approval to cancel the previously authorized Series B Preferred Stock and to amend the Articles of Incorporation to increase the number of authorized shares of Series C Preferred Stock from 150,000 to 500,000 shares. The letter informed the shareholders that the sale of the additional Series C Preferred Stock would be used to retire certain Series A Preferred Stock, to retire bank debt and/or to fund the balance of the redemption price due to Reed Taylor. The letter was

3

accompanied by a Confidential Private Placement Memorandum, dated June 1, 1995 ("PPM"), offering up to 500,000 shares of Series C Preferred Stock for $10 per share. The PPM explained: "Assuming the Company sells the maximum number of Shares offered hereby, the net proceeds from this private placement are expected to be sufficient . . . . If the Company sells only the minimum number of shares, additional financing will be required to complete the proposed reorganization."

On July 12, 1995, AIA Services issued an Amended Notice of Special Meeting of AIA Services Shareholders to occur on July 18, 1995, accompanied by a Disclosure Statement. The notice states that certain transactions contemplated as part of the new reorganization plan require shareholder approval. Neither the notice nor the accompanying disclosure mentions the redemption of Reed Taylor's common stock. At the July 18 meeting, the shareholders were not asked to approve, and did not approve, the redemption of Reed Taylor's common stock. However, on that day, AIA Services' Board of Directors authorized the redemption of Reed Taylor's common stock for $7.5 million and other consideration. The resolution provides that "the amount of the down payment for Mr. Taylor's Common Stock which [AIA Services] may be able to afford will depend on the amount of proceeds from commercial loans and from the sale of additional Series C Preferred Stock and attendant warrants."

AIA Services and Reed Taylor entered into a Stock Redemption Agreement effective July 22, 1995, to redeem all of Reed Taylor's common stock for $7.5 million and other consideration. AIA Services originally agreed to pay $1.5 million at the closing of the Stock Redemption Agreement; however, the parties entered into an Addendum whereby AIA Services would issue a $1.5 million down payment note payable 90 days after closing (the "$1.5M Note"). Pursuant to the Stock Redemption Agreement, Reed Taylor was given debt forgiveness, transfer of title to airplanes and other payments aggregating over $2 million. The balance of the $7.5 million redemption price was to be paid pursuant to a promissory note dated August 1, 1995, in the principal amount of $6 million (the "$6M Note"). The $6M Note provided for monthly interest payments and for all principal and accrued interest to be paid on August 1, 2005. As collateral for the Stock Redemption Agreement, the parties entered into a security agreement that granted Reed Taylor a secured interest in most of AIA Services' assets.

AIA Services was not able to pay the $1.5M Note when it became due on October 20, 1995, and Reed Taylor notified AIA Services that it was in default by three letters from April

4

through June, 1996. On July 1, 1996, Reed Taylor and AIA Services executed the Stock Redemption Restructure Agreement, which called for the $1.5M Note to be paid on October 31, 1996, and the $6M Note to be paid in full on July 1, 2005, with interest payments for ten years. AIA Services again failed to pay the $1.5M Note when it became due, and AIA Services fell behind in making interest payments on the $6M Note.

On January 29, 2007, Reed Taylor filed the Complaint in this lawsuit seeking to obtain the money owed under the Stock Redemption Agreement and the Stock Redemption Restructure Agreement (collectively hereinafter the "Stock Redemption Agreement"). The defendants (hereinafter "Respondents") include AIA Services, AIA Insurance and John Taylor (Reed Taylor's brother and business partner), who were named in the original complaint, as well as other managers and directors of AIA Services, who were added in later amended complaints. The 401(k) Profit Sharing Plan for AIA Services Corporation (the Plan) intervened to assert the illegality of the Stock Redemption Agreement.

In April, 2008, Respondents filed a motion for partial summary judgment concerning the legality of the Stock Redemption Agreement, arguing that when the agreement was entered into, it violated the then-existing I.C. § 30-1-6, which authorizes corporations to redeem their shares but places restrictions on the source of funds used to redeem shares. The district court granted partial summary judgment in favor of Respondents in its Opinion and Order dated June 17, 2009. The district court found that the Stock Redemption Agreement violated I.C. § 30-1-6 because AIA Services did not have any earned surplus when it entered into the agreement and was not authorized by its articles of incorporation or by majority shareholder vote to use capital surplus to pay for Reed Taylor's shares. The district court then declared the Stock Redemption Agreement illegal and unenforceable and concluded that it must leave the parties where it finds them.

The district court denied Reed Taylor's motion for reconsideration in its Opinion and Order dated August 13, 2009. The district court issued a Judgment dismissing six of the eleven causes of action in Reed Taylor's Fifth Amended Complaint. Reed Taylor appealed to this Court. On September 01, 2010, we granted Respondents' motion to dismiss certain extraneous issues raised on appeal by Reed Taylor which were beyond the scope of the I.R.C.P. 54(b) certified partial judgment.

## II. STANDARD OF REVIEW

This Court set forth the standard of review for an appeal from an order on summary judgment in *Jones v. HealthSouth Treasure Valley Hospital*:

> When reviewing an order for summary judgment, this Court applies the same standard of review as was used by the trial court in ruling on the motion for summary judgment. *See Cristo Viene Pentecostal Church v. Paz*, 144 Idaho 304, 307, 160 P.3d 743, 746 (2007). Summary judgment is proper "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). "If there is no genuine issue of material fact, only a question of law remains, over which this Court exercises free review." *Cristo*, 144 Idaho at 307, 160 P.3d at 746 (quoting *Infanger v. City of Salmon*, 137 Idaho 45, 47, 44 P.3d 1100, 1102 (2002)).
>
> "It is axiomatic that upon a motion for summary judgment the non-moving party may not rely upon its pleadings, but must come forward with evidence by way of affidavit or otherwise which contradicts the evidence submitted by the moving party, and which establishes the existence of a material issue of disputed fact." *Zehm v. Associated Logging Contractors, Inc.*, 116 Idaho 349, 350, 775 P.2d 1191, 1192 (1988). This Court liberally construes all disputed facts in favor of the nonmoving party, and all reasonable inferences drawn from the record will be drawn in favor of the nonmoving party. *Cristo*, 144 Idaho at 307, 160 P.3d at 746. If reasonable persons could reach differing conclusions or draw conflicting inferences from the evidence presented, then summary judgment is improper. *McPheters v. Maile*, 138 Idaho 391, 394, 64 P.3d 317, 320 (2003).

147 Idaho 109, 112, 206 P.3d 473, 476 (2009).

"The burden of showing the trial court abused its discretion rests with the appellant." *Walker v. Boozer*, 140 Idaho 451, 456, 95 P.3d 69, 74 (2004). In reviewing a trial court's abuse of discretion, this Court considers: (1) whether the court correctly perceived the issue as discretionary; (2) whether the court acted within the outer boundaries of its discretion and consistently with applicable legal standards; and (3) whether it reached its decision by an exercise of reason. *Stewart v. Stewart*, 143 Idaho 673, 678, 152 P.3d 544, 549 (2007).

This Court will not consider an issue which is not supported by argument and authority in the opening brief. *Liponis v. Bach*, 149 Idaho 372, 374, 234 P.3d 696, 698 (2010). "The argument shall contain the contentions of the appellant with respect to the issues presented on appeal, the reasons therefor, with citations to authorities, statues and parts of the transcript and the record relied upon." I.A.R. 35(a)(6).

"This Court will not reverse the trial court if an alleged error is harmless. . . . [I]f an error did not affect a party's substantial rights or the error did not affect the result of the trial, the error

is harmless and not grounds for reversal." *Myers v. Workmen's Auto Ins. Co.*, 140 Idaho 495, 504, 95 P.3d 977, 986 (2004). *See* I.R.C.P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").

## III. ANALYSIS

The district court granted partial summary judgment in favor of Respondents upon determining that the Stock Redemption Agreement violated I.C. § 30-1-6 and was, therefore, illegal. Idaho Code § 30-1-6 (1995)[1] provides, in relevant part:

> **Right of corporation to acquire and dispose of its own shares.** A corporation shall have the right to purchase . . . its own shares, but purchases of its own shares . . . shall be made only to the extent of unreserved and unrestricted earned surplus available therefor, and, if the articles of incorporation so permit or with the affirmative vote of the holders of a majority of all shares entitled to vote thereon, to the extent of unreserved and unrestricted capital surplus available therefor.

Thus, pursuant to I.C. § 30-1-6, a corporation is generally authorized to use earned surplus to redeem shares; whereas, the use of capital surplus to redeem shares requires authorization either in the articles of incorporation or by majority shareholder vote.

On appeal, Reed Taylor argues: (1) AIA Services had sufficient earned surplus to enter into the Stock Redemption Agreement; (2) AIA Services was authorized by shareholder vote to redeem the shares out of capital surplus; (3) I.C. § 30-1-6 does not apply, because AIA Services redeemed Reed Taylor's shares on credit; (4) Respondents and the Plan are barred from asserting illegality, because they are not intended beneficiaries of I.C. 30-1-6; and (5) even if the Stock Redemption Agreement is illegal, it is nevertheless enforceable under multiple exceptions to illegality. Reed Taylor also raises other issues, all of which are addressed in turn. On cross appeal, Respondents argue that the district court erred in dismissing only six of Reed Taylor's causes of action and ask this Court to dismiss the remaining five causes of action.

**A. The Stock Redemption Agreement violates I.C. § 30-1-6.**

> 1. AIA Services had no earned surplus when it entered into the Stock Redemption Agreement.

---

[1] The parties agree that 1995 is the relevant year in this case, as the Stock Repurchase Agreement was entered into in 1995. The 1996 agreement only restructured the payment of the 1995 agreement. The 1996 agreement did not itself provide for repurchasing shares.

Pursuant to the Stock Redemption Agreement, AIA Services agreed to pay Reed Taylor $7.5 million and give other consideration. In the Opinion and Order dated June 17, 2009, the district court found:

> Without exception, each of the accountants, including Plaintiff's expert, found AIA had no earned surplus in the years 1995 and 1996, but instead had an earned deficit. During oral arguments, counsel for Plaintiff conceded that the earned surplus numbers for AIA in 1995 and 1996 were in the negative and that no amount of accounting adjustment of numbers would turn the earned surplus sufficient to cover the $7.5 million debt incurred to Reed Taylor.

According to Reed Taylor, while he admits to acknowledging that AIA Services' balance sheets suggest that it had insufficient earned surplus, a corporation's balance sheet is not the conclusive indicator of earned surplus. Reed Taylor argues that the district court erred when it failed to consider the fair market value of AIA Services and asserts that the following evidence shows that AIA Services had sufficient earned surplus to redeem his shares: (1) appraisals from 1995 and 1996 that value a minority interest in AIA Services at $2 million and $4 million respectively; (2) a 1994 appraisal valuing the whole company at over $19 million; (3) Reed Taylor's valuation of the commissions and contractual relationships held by AIA Services at over $24 million in 1995; and (4) AIA Services' projection of substantial earnings upon redeeming Reed Taylor's shares and redirecting the company.

Reed Taylor relies primarily on *Klang v. Smith's Food & Drug Centers, Inc.*, 702 A.2d 150, 152 (Del. 1997), where the Delaware Supreme Court explained that "[b]alance sheets are not . . . conclusive indicators of surplus or a lack thereof." However, at issue in *Klang* was whether a corporation had sufficient "surplus" to redeem shares without violating a statutory prohibition against the impairment of capital. *Id.* at 153. In the case at hand, "earned surplus" is at issue, which Idaho Code distinguished from "surplus."

"Surplus" is defined in Idaho as "the excess of the net assets of a corporation over its stated capital." I.C. § 30-1-2(k). "Earned surplus" is defined as follows:

> "Earned surplus" means the portion of the surplus of a corporation equal to the balance of its *net profits, income, gains and losses* from the date of incorporation, or from the latest date when a deficit was eliminated by an application of its capital surplus or stated capital or otherwise, after deducting subsequent distributions to shareholders and transfers to stated capital and capital surplus to the extent such distributions and transfers are made out of earned surplus. Earned surplus shall include also any portion of surplus allocated to earned surplus in mergers, consolidations, or acquisitions of all or substantially all of the

8

outstanding shares or of the property and assets of another corporation, domestic or foreign.

I.C. § 30-1-2(l) (emphasis added). "Capital surplus" is defined as "the entire surplus of a corporation other than its earned surplus." I.C. § 30-1-2(m).

American Law Reports explains:

[G]enerally for the protection of its creditors, the right of a corporation to purchase its own stock has been limited in various ways, such as a prohibition against such purchase when it would impair the capital of the corporation or while it is insolvent or when the transaction will render it insolvent.

Apparently to make it easier to determine whether a corporation, at a particular point in time, may legally purchase its own shares, some states have required, by statute, that corporations may purchase their shares of stock only out of some fund in excess of capital, expressly limited by some statutes to earned surplus and more broadly defined by others to include surplus in general. In other words, a corporation cannot use its capital to purchase its stock. The terms "surplus" and "surplus profits" usually include various types of surplus which generally represent the excess of the aggregate value of assets over and above the aggregate value of liabilities. It has, however, been pointed out that whether a corporation has a surplus should be determined by examining the actual value, not the book value, of the corporation. *On the other hand, "earned surplus" has a narrower scope and has been construed to include only actual earnings or profits*.

61 A.L.R.3d 1049 ch. I § 2 (2009) (emphasis added).

First, Reed Taylor provides no argument or explanation as to how any of the four pieces of evidence he set forth constitute earned surplus as then defined by I.C. § 30-1-2(k): profits, income or gains. Even if they do go toward earned surplus, Reed Taylor provides no argument or explanation as to whether they create a sufficient amount of earned surplus such that the agreement satisfies I.C. § 30-1-6. In his brief, Reed Taylor merely asserts that earned surplus is not limited to balance sheets and sets forth the four pieces of evidence.

Second, none of these four pieces of evidence upon which Reed Taylor relies constitute earned surplus. As to AIA Services' projections of future earnings and to Reed Taylor's valuation of AIA Services' commissions and contractual obligations, these are anticipated earnings, not actual earnings, and are not earned surplus. *See Mindenburg v. Carmel Film Prods.*, 282 P.2d 1024, 1030 (Cal. Ct. App. 1955) ("The law is settled to the effect that paper profits, or anticipated earnings, or accrued items of debit or credit are not to be taken into consideration in computing earned surplus, either for purpose of dividends or as a basis for corporate purchase of its own shares of stock."). As to the other two pieces of evidence Reed

Taylor puts forth, which are the appraisals of the company and the appraisals of minority shareholder interests, even assuming that they show some kind of increase in value (which Reed Taylor does not explain in his brief), such increases would not be earned surplus. *See Berks Broadcasting Co. v. Craumer*, 52 A.2d 571, 573 (Pa. 1947) (earned surplus does not include an unrealized appreciation in the value of fixed assets but must be founded on actual earnings or profits).

Therefore, we affirm the district court's finding that AIA Services had insufficient earned surplus at the time it entered into the Stock Redemption Agreement.

2. AIA Services was not authorized to use capital surplus to fund the Stock Redemption Agreement.

Respondents and the Plan argue, and the district court held, that in order to authorize the use of capital surplus by shareholder vote, the shareholder vote must explicitly authorize the use of capital surplus and that the shareholder votes approving the Stock Redemption Agreement and the Resolutions failed to satisfy I.C. § 30-1-6 because they did not specifically designate the source of funds for the payment of the promissory notes. Reed Taylor argues that AIA Services' shareholders impliedly authorized the use of capital surplus by voting in favor of the Stock Redemption Agreement. More specifically, according to Reed Taylor, the AIA Services shareholder votes approving the Stock Redemption Agreement and the Resolutions impliedly authorized the use of capital surplus, because: (1) the February 9, 1995 Notice of Special Meeting of Shareholders to approve the Stock Redemption Agreement sought approval for "[a]ll corporate actions necessary to . . . reorganize the Company"; (2) the March 7, 1995 shareholder vote in favor of the Stock Redemption Agreement approved "[a]ll other corporate actions necessary" and was not conditioned on AIA Services first selling a certain number of new shares; and (3) the July 18, 1995 shareholder vote in favor the Resolutions not only approved all of the terms of the Stock Redemption Agreement but also approved the use of capital assets "to secure payment of the corporation's promissory note for the balance of the redemption price".

As set forth in *BHC Intermountain Hospital, Inc. v. Ada County*, 150 Idaho 93, 95, 244 P.3d 237, 239 (2010):

> The interpretation of a statute is a question of law over which this Court exercises free review. The statute is viewed as a whole, and the analysis begins with the language of the statute, which is given its plain, usual and ordinary meaning. In determining the ordinary meaning of the statute, effect must be given to all the words of the statute if possible, so that none will be void, superfluous, or

10

redundant. However, if the language of the statute is capable of more than one reasonable construction it is ambiguous, and a statute that is ambiguous must be construed with legislative intent in mind, which is ascertained by examining not only the literal words of the statute, but the reasonableness of the proposed interpretations, the policy behind the statute, and its legislative history.

(Citations and quotations omitted).

The opening clause of I.C. § 30-1-6 provides that corporations may purchase their own shares; however, the remainder of this first sentence limits a corporation to making such purchases with "unreserved and unrestricted earned surplus available therefore, and, *if the articles of incorporation so permit or with the affirmative vote of the holders of a majority of all shares entitled to vote thereon*, to the extent of unreserved and unrestricted capital surplus available therefore." (Emphasis added). Admittedly, the language of the statute does not entirely foreclose the possibility that the thing which a majority of shareholders must vote in favor of in order to authorize the use of capital surplus is the stock redemption agreement. However, under a plain, natural reading of the statute, in order to authorize the use of capital surplus to redeem stock, the thing which a majority of shareholders must vote in favor of is the use of capital surplus to redeem stock—not merely the redemption of stock.

On appeal, none of the parties cite any authority as to whether a shareholder vote must explicitly authorize the use of capital surplus to redeem shares or whether implicit authorization suffices. Upon reviewing the published cases from other jurisdictions which cite to statutes which are nearly identical to I.C. § 30-1-6, only the Oregon Court of Appeals appears to have touched on this issue. *See*, *e.g.*, *Am. Family Care v. Am. Family Physicians*, 571 So.2d 1053 (Ala. 1990); *McCreery v. RSA Mgmt.*, 287 S.E.2d 203 (Ga. 1982), *Evanenko v. Farmers Union Elevator*, 191 N.W.2d 258 (N.D. 1971). In *Hansen v. Singmaster Ins. Agency*, 722 P.2d 1254, 1256–57 (Or. Ct. App. 1986), the Oregon Court of Appeals found that the shareholders of a corporation voted to authorize the use of capital surplus pursuant to ORS 57.035(1),[2] which has the same earned surplus limitation and capital surplus authorization requirement as does I.C. § 30-1-6.

The stock redemption agreement in *Hansen*, which was signed by all of the corporation's stockholders, provided that if the defendant did not have sufficient surplus out of which to make payments as they became due, then it would "promptly take all required action to enable it to

---

[2] Repealed by Laws 1987, ch. 52, § 181.

make such payment out of surplus, including . . . a reappraisal of [its] assets to reflect the market value of [its] assets . . . in the event such market value exceeds the book value thereof." *Id.* at 1256. The issue presented to the *Hansen* court was whether the shareholders' signatures of the agreement constituted a majority vote, and the court held that this was such a vote. *Id.* at 1257. The *Hansen* court did not provide any analysis as to its finding that this vote authorized the use of capital surplus.

Even though the stock redemption agreement in *Hansen* did not explicitly use the term "capital", it explicitly authorized the use of capital surplus. In *Hansen*, the stock redemption agreement specifically addressed what would happen if the corporation had insufficient surplus when payments became due, and the agreement provided the specific steps the corporation would take in such event (reappraising assets) to generate capital surplus. *Id.* at 1256. Whereas, in the case at hand, Reed Taylor relies on general authorizations to effectuate the goals of reorganizing AIA Services and repurchasing his stock without pointing to specific provisions related to funding sources.

We agree with the district court where it stated in the Opinion and Order dated August 13, 2009:

> Plaintiff further contends that a shareholder vote to redeem Reed Taylor's shares implied shareholder consent to draw from capital surplus for the purchase. The Court does not read the 1995 version of I.C. § 30-1-6 so broadly. . . . In 1995, when the shareholders of AIA voted to redeem Reed Taylors shares, the corporation had insufficient earned surplus for the purchase, yet no vote to draw from capital surplus was obtained from shareholders as required by statute. Neither the redemption agreement itself nor the resolution designated the source of funds for the future promissory note payment. *Such a substantial obligation cannot be incurred by implication.*

(Emphasis added).

Accordingly, we hold that, in order for a shareholder vote to authorize the use of capital surplus to redeem stock, I.C. § 30-1-6 requires that the shareholder vote explicitly authorize the use of capital surplus. A vote merely authorizing the redemption of stock does not suffice. Therefore, AIA Services' shareholders did not authorize the use of capital surplus to redeem Reed Taylor's shares when they voted in favor of the Stock Redemption Agreement and the Resolutions.

3. The 500,000 shares AIA Services redeemed on credit are subject to the earned and capital surplus limitations of I.C. § 30-1-6; of the remaining 113,494 shares AIA Services redeemed, those redeemed in exchange for airplanes are subject to the surplus

limitations, and those redeemed to cancel Reed Taylor's debt to AIA Services are not subject to the surplus limitations.

Pursuant to the Stock Redemption Agreement, AIA Services purchased 500,000 of Reed Taylor's shares with credit. Reed Taylor argues that the earned and capital surplus restrictions in I.C. § 30-1-6 should not apply when a company purchases its own shares on credit. Reed Taylor relies on *Garrity v. Radel*, 197 A.2d 775, 777 (Conn. 1964), for the proposition that a stock redemption statute similar to I.C. § 30-1-6 does "not prohibit a corporation from purchasing its own shares on credit." Respondents acknowledge that nothing in I.C. § 30-1-6 appears to prohibit redeeming stock on credit; however, Respondents argue that stock purchased by a corporation on credit is still subject to the earned and capital surplus limitations, and Respondents point out that in *Garrity* there was "no claim that there was an insufficient unreserved or unrestricted capital surplus." *Id.*

We hold that I.C. § 30-1-6 allows redeeming stock on credit, but the earned and capital surplus restrictions still apply. The primary purpose of stock redemption statutes is to protect minority shareholders and creditors from corporate mismanagement by preventing boards of directors from draining corporate assets. 19 C.J.S. *Corporations* § 663. Nothing in I.C. § 30-1-6 suggests that the timing of payment has any bearing on the statute's applicability, and given the statute's purpose, it would be an absurd result to allow a corporation to get around these restrictions by simply paying on a later date.

Pursuant to the Stock Redemption Agreement, in addition to purchasing 500,000 shares with the two notes totaling $7.5 million, AIA Services agreed to "redeem Mr. Taylor's remaining common stock of 113,494 shares by transferring the Company's aircraft to Mr. Taylor, subject to its debt of approximately $590,000, and cancellation of approximately $480,000 in indebtedness to the Company." Reed Taylor claims that these shares are not subject to I.C. § 30-1-6 and asserts that the district court erred by never addressing this issue. According to Reed Taylor, the gross value of these shares should be deducted from the amount of earned surplus that would be required to redeem his shares.

After imposing the earned and capital surplus limitations, I.C. § 30-1-6 provides: "Notwithstanding the foregoing limitation, a corporation may purchase or otherwise acquire its own shares for the purpose of . . . (b) Collecting or compromising indebtedness to the corporation." Therefore, any shares exchanged to cancel Reed Taylor's indebtedness to AIA Services are not subject to the earned and capital surplus limitations of I.C. § 30-1-6. However,

13

Reed Taylor has not explained with any argument or authority how the shares exchanged for airplanes are exempt from the earned and capital surplus limitations of I.C. § 30-1-6. Therefore, the shares exchanged for airplanes must comply with the earned and capital surplus limitations.

**B. The Stock Redemption Agreement is illegal and unenforceable, and we leave the parties as we find them.**

Reed Taylor argues: (1) none of the Respondents nor the Plan can raise I.C. § 30-1-6 to invalidate the Stock Redemption Agreement; (2) a violation of I.C. § 30-1-6 does not render the Stock Redemption Agreement illegal and unenforceable; and (3) multiple exceptions to the rule that an illegal contract is unenforceable and requires a court to leave the parties where they lie apply to this case. These issues are addressed in turn.

1. The Stock Redemption Agreement's compliance with I.C. § 30-1-6 was properly raised.

Reed Taylor argues that the district court erred in finding the Stock Redemption Agreement illegal after first finding that no party had "standing" to assert the illegality. Reed Taylor relies on *La Voy Supply Co. v. Young*, 84 Idaho 120, 127, 369 P.2d 45, 49 (1962), for the proposition that a corporation cannot have a stock repurchase declared illegal. He also relies heavily on *Minnelusa Co. v. A.G. Andrikopoulos*, 929 P.2d 1321, 1323 (Colo. 1996), where the Colorado Supreme Court explained: "Stock repurchase statutes are designed to protect creditors and minority stockholders from corporate mismanagement of assets." The *Minnelusa* Court went on to hold:

> A shareholder who is fully aware of, and consents to, a questionable transaction may not thereafter attack that transaction by requesting it be declared illegal. . . . [The shareholder] is not an intended beneficiary of the Florida stock repurchase statute, we hold that [the shareholder] may not use the Florida stock repurchase statute to relieve him of his personal guarantee on the promissory notes.

*Id.* at 1324–25. According to Reed Taylor, neither the Plan nor any of Respondents are intended beneficiaries of I.C. § 30-1-6, and therefore, they are barred from raising I.C. § 30-1-6 to attack the Stock Redemption Agreement

In its Opinion and Order dated June 17, 2009, the district court found that neither the Plan nor any Respondents had standing to assert the defense of illegality. Specifically, the district court found that neither the Plan nor any Respondents were creditors of AIA Services when the corporation entered into the Stock Redemption Agreement. The district court also found that neither the Plan, James Beck, nor Corrine Beck were shareholders at the time of the agreement.

14

Finally, the district court found that Connie Taylor and John Taylor, who were shareholders when the agreement was made, consented to Stock Redemption Agreement by voting their community shares in favor of the agreement.

First, we clarify that this is not an issue of standing. Standing is a subcategory of justiciability, and the standing inquiry is focused on the party seeking relief. *Martin v. Camas Cnty.*, 150 Idaho 508, __, 248 P.3d 1243, 1248 (2011). The Respondents are defendants and have invoked I.C. § 30-1-6 as a defense; thus, standing is not at issue.

As a general matter, we explained in *Stearns v. Williams*, 72 Idaho 276, 290, 240 P.2d 833, 842 (1952), that "a court of equity will not knowingly aid in the furtherance of an illegal transaction; in harmony with this principle, it does not concern itself as to the manner in which the illegality of a matter before it is brought to its attention." Therefore, John and Connie Taylor, who were minority shareholders when the Stock Redemption Agreement was entered into, may assert all legal and equitable defenses they have.

2. The Stock Redemption Agreement is an illegal contract.

"An illegal contract is one that rests on illegal consideration consisting of any act or forbearance which is contrary to law or public policy," and such a contract "is illegal and unenforceable." *Farrell v. Whiteman,* 146 Idaho 604, 609, 200 P.3d 1153, 1158 (2008). "[W]hen the consideration for a contract explicitly violates a statute, the contract is illegal and unenforceable." *Id.* In *Trees v. Kersey*, we explained:

> The illegality of a contract . . . can be raised at any stage in litigation. The Court has the duty to raise the issue of illegality *sua sponte*. Whether a contract is illegal is a question of law for the court to determine from all the facts and circumstances of each case. An illegal contract is one that rests on illegal consideration consisting of any act or forbearance which is contrary to law or public policy. The general rule is that a contract prohibited by law is illegal and unenforceable. A contract which is made for the purpose of furthering any matter or thing prohibited by statute is void. This rule applies on the ground of public policy to every contract which is founded on a transaction prohibited by statute. The Idaho Court of Appeals has suggested that where a statute intends to prohibit an act, it must be held that its violation is illegal, without regard to the reason of the inhibition or to the ignorance of the parties as to the prohibiting statute.

138 Idaho 3, 6–7, 56 P.3d 765, 768–69 (2002) (citations and quotations omitted).

Idaho Code § 30-1-6 authorizes a corporation to purchase its own shares but limits the corporation to using only earned surplus and, if authorized, capital surplus to make the purchase. Because AIA Services had no earned surplus and was not authorized to use capital surplus when

it agreed to purchase Reed Taylor's shares, the Stock Redemption Agreement violated the earned and capital surplus limitations of I.C. § 30-1-6. Based upon a review of the policy for the statute and the facts in this case, the Stock Redemption Agreement is thereby prohibited by law and is illegal.

3. None of the exceptions to the rule that an illegal contract is void and unenforceable put forth by Reed Taylor are applicable in this case.

"If a contract is illegal and void, the court will leave the parties as it finds them and refuse to enforce the contract." *Wernecke v. St. Maries Joint School Dist. # 401*, 147 Idaho 277, 287, 207 P.3d 1008, 1018 (2009). In *Wernecke*, this Court noted that Idaho recognizes the following exceptions to illegality:

> This Court has recognized a certain limited exception to the illegality doctrine when public policy requires that some relief be granted. *Farrell v. Whiteman*, 146 Idaho 604, 200 P.3d 1153 (2009). Additionally, when parties are not "in pari delicto" or when fraud, undue influence, or duress are present relief may be granted to the innocent party. *Barry v. Pac. W. Constr., Inc.*, 140 Idaho 827, 833, 103 P.3d 440, 446 (2004). Finally, this Court has allowed some relief to insureds who signed void insurance contracts, in cases where unenforceability would "defeat the purpose for which a statute has been enacted." *Id.*

*Werneck,* 147 Idaho at 288 n.12, 207 P.3d at 1019 n.12. Reed Taylor argues that even if the Stock Redemption Agreement is illegal, it should still be enforced for the following reasons: (1) the shareholders acquiesced to the redemption for over twelve years; (2) he was justifiably ignorant and an innocent party and/or not *in pari delicto*; (3) the fraud exception to illegality applies; (4) the violation was merely technical; and (5) public policy grounds support enforcing the redemption agreement. Each of Reed Taylor's arguments are addressed in turn.

First, an illegal contract "cannot be treated as valid by invoking waiver or estoppel." *Id.* at 287, 207 P.3d at 1018.

Second, as to Reed Taylor's argument that he was justifiably ignorant, he relies on *Williams v. Cont'l Life & Accident Co.*, 100 Idaho 71, 73, 593 P.2d 708, 710 (1979), in which this Court explained that the "general rule is that a contract prohibited by law is illegal and unenforceable" but that an "exception is that '[a]n innocent plaintiff may recover on an illegal agreement which is not declared void by statute. Such innocence exists where the plaintiff is justifiably ignorant of the circumstances causing the illegality.'" (*Quoting* 14 S. Williston, *Contracts* § 1631 (3d ed. 1972)). While the record suggests that Reed Taylor may have been ignorant of the existence of the earned and capital surplus limitations of I.C. § 30-1-6, a party's

ignorance of the law does not make an illegal contract enforceable. *Trees*, 138 Idaho at 6–7, 56 P.3d at 768–69 ("where a statute intends to prohibit an act, it must be held that its violation is illegal, without regard to . . . the ignorance of the parties as to the prohibiting statute."). Nothing suggests that Reed Taylor, as CEO and Chairman of the Board, as well as majority shareholder, was justifiably ignorant as to the circumstances causing the illegality—the insufficient earned surplus and absence of a shareholder vote explicitly authorizing the use of capital surplus.

Reed Taylor also makes a similar argument that he was not equally at fault (he was not "*in pari delicto*"). In *McShane v. Quillin*, 47 Idaho 542, 547, 277 P. 554, 559 (1929), we recognized this exception to illegality, stating: "[W]here the parties are not *in pari delicto*, the innocent party may recover. This is particularly true where the prohibition of the statute . . . is aimed at the act of the defendant, and not at that of the plaintiff." Reed Taylor sets forth a lengthy explanation in his brief as to how he was in no position to understand the circumstances surrounding the Stock Redemption Agreement and how AIA Services and its attorneys were in a better position to understand the situation and are thus more at fault. The district court ruled: "This is not a case where the parties to the agreement were not *in pari delicto* . . . . If Reed Taylor was uninformed as to the financial status of his corporation, that was a voluntary choice on his part and is insufficient to make him an innocent party to the agreement." We agree. Reed Taylor was the majority shareholder of AIA Services, CEO and Chairman of the Board when he entered into the Stock Redemption Agreement.

Third, Reed Taylor argues that even if the Stock Redemption Agreement is illegal, it should be enforced because he was fraudulently induced to enter into the agreement by an opinion letter (the Opinion Letter), which offered the opinion that the Stock Redemption Agreement was legal. The Opinion Letter was written by a law firm, acting as general counsel for AIA Services in connection with the agreement, and was addressed to Reed Taylor. Reed Taylor argues that the district court erred in: (1) refusing to enforce the Stock Redemption Agreement based upon fraud; (2) finding that the Opinion Letter did not provide factual representations or mixed representations of fact and opinion; and (3) making these decisions on fraud without ever permitting Reed Taylor to depose or conduct discovery with the attorneys who rendered the opinions and factual representations to him. Reed Taylor makes no argument and provides no explanation on these claims; he merely states that the district court made these errors. Furthermore, Reed Taylor cites nothing in the record except for the district court's

17

Opinion and Order granting partial summary judgment and its Opinion and Order on the motion for reconsideration.

Establishing fraud requires showing a false statement of fact on which the plaintiff relied. *See Country Cove Dev. v. May*, 143 Idaho 595, 600–01, 150 P.3d 288, 293–294 (2006).

> Opinions and predictions cannot form the basis of a fraud claim because they do not speak to matters of fact. An exception to the general rules exists where a false prediction or opinion is given with the intent to mislead. . . . [W]here a speaker gives an opinion when he is aware of facts incompatible with such opinion, the opinion may amount to a false statement of fact if made with the intention of deceiving or misleading.

*Id.* at 601, 150 P.3d at 294. The district court concluded:

> [The Opinion Letter] expressed an opinion that no statute was violated by the stock redemption agreement, an opinion currently postulated to the Court by Plaintiff. Such an opinion was no more a statement of fact when expressed by corporate counsel in 1995 than it is now when asserted by Plaintiff. It is, simply, an opinion based on one's interpretation of law and cannot form the basis for a fraud claim.

We affirm the district court in dismissing Reed Taylor's fraud argument. On appeal, Reed Taylor merely states the general proposition that an opinion can form the basis for fraud when there is intent to mislead, but he does not actually argue that anyone intended to mislead him in this case and points to nothing in the record suggesting that anyone had such intent. As to Reed Taylor's claim that the district court erred in finding an absence of fraud without giving him the opportunity to depose or conduct discovery with the lawyers who authored the Opinion Letter, Reed Taylor again makes no argument in this section of his brief concerning this issue.

Fourth, Reed Taylor argues that a mere technical violation of a statute does not render a contract void unless the statute so provides, citing *Miller v. Haller*, 129 Idaho 345, 924 P.2d 607 (1996). At issue in *Miller* was the legality of an oral contract which provided that if Miller voluntarily left the Silverton Partnership, surgical referrals to Miller would continue to be made in the same pattern as such referrals had been made previously. *Id.* at 351–52, 924 P.2d at 614. This argument was based upon: (1) an Idaho Code provision giving the state board of medicine specific grounds for disciplining a licensed physician, including the division of fees or gifts or agreements to split or divide fees or gifts received for professional services in exchange for referral; and (2) a federal statute making the giving or receiving of remuneration, directly or indirectly, in exchange for referrals involving Medicare patients a felony. *Id.* This Court held:

18

"This is not the form of consideration strictly proscribed by the statutes, and, for that reason, the oral contract alleged here cannot be termed illegal, as a matter of law." *Id.*

Reed Taylor provides no explanation as to how the Stock Redemption Agreement's violation of I.C. § 30-1-6 is merely a "technical violation", and he makes no argument as to how the unauthorized use of capital surplus or the use of other funds when there is no earned surplus is not the kind of use of funds to redeem stock which is strictly prohibited by I.C. § 30-1-6. The Stock Redemption Agreement appears to be precisely the type of agreement that I.C. § 30-1-6 seeks to prohibit, as the agreement could drain AIA Services for the benefit of Reed Taylor—the sixty-three percent majority shareholder—at the expense of any minority shareholders or creditors.

Finally, Reed Taylor argues that the Stock Redemption Agreement should be enforced as a matter of public policy.

> This Court has recognized situations in which relief to a party to an illegal contract is warranted to avoid unduly harsh results. In such instances, the Court has awarded damages based on the rationale that, although illegal contracts are unenforceable as a matter of public policy, circumstances arise where denying a party relief would frustrate the public interest more than "leaving the parties where they lie." This Court has stated that, "[b]arring the strict application of the illegality doctrine, the central focus must be whether the ends of the law will be furthered or defeated by granting the relief requested." *Trees*, 138 Idaho at 9, 56 P.3d at 771.

*Barry v. Pac. West Constr.*, 140 Idaho 827, 833, 103 P.3d 440, 446 (2004).

The only public policy argument Reed Taylor sets forth which is not merely a restatement of one of the above grounds Idaho recognizes for enforcing an otherwise illegal contract is that the Stock Redemption Agreement should be enforced given the malfeasance of the other parties and their attorneys in engineering this illegal agreement and unlawfully transferring millions of dollars from AIA Services to another entity, CropUSA. As already explained, the Stock Redemption Agreement is precisely the type of agreement that public policy prohibits, as it was entered into when AIA Services had no earned surplus and was not authorized to use capital surplus; thus, the agreement implicates concerns that it was intended to favor Reed Taylor at the expense of minority shareholders and creditors. To the extent that not enforcing the agreement seems harsh given that AIA Services is trying to get out of an agreement it chose to enter into and given that it appears that none of the parties recognized the potential violation of I.C. § 30-1-

19

6, it must be noted that Reed Taylor has already received substantial sums of money from AIA Services pursuant to the agreement.[3]

## C. We will not consider whether the district court erred or abused its discretion in making certain findings in its orders.

In his opening brief, Reed Taylor asserts the following issue on appeal: "The court erred when it made certain other findings in its Motion for Partial Summary Judgment and Reed's Motion for Reconsideration." His argument on this issue reads:

> The court erred and abused its discretion when it made the following findings which were not based upon evidence in the record: that the statute of limitations did not apply. *Noyes*, 255 B.R. at 602; I.C. §§ 5-237; 5-224; 5-237; that Reed was not more innocent; that Reed was not justifiably ignorant, and that Reed was in a position to have intimate knowledge of AIA's finances (among other findings in both orders not supported by the evidence); and when the court refused to address all of Reed's arguments and objections in both motions. (R. Vol. XLV-XLVI, p. 8838–52, 9014–24.) At a minimum, for these reasons and all the reasons asserted in this Brief, the court abused its discretion and erred when it did not at least find an issue of fact precluding partial summary judgment in favor of Connie and Beck and when it failed to consider all of Reed's arguments and the evidence submitted in support of those arguments. Should the Court not enter partial summary judgment in favor of Reed, the Court should order all arguments to be considered and fully and fairly evaluated with the evidence on remand.

It is well established that this Court will not consider an issue raised on appeal if the error complained of is not identified, or if the issue is not supported by cogent argument and authority, in the opening brief. Idaho Appellate Rule 35(a)(6) requires: "The argument shall contain the contentions of the appellant with respect to the issues presented on appeal, the reasons therefor, with citations to authorities, statutes and parts of the transcript and the record relied upon." "Regardless of whether an issue is explicitly set forth in the party's brief as one of the issues on appeal, if the issue is only mentioned in passing and not supported by any cogent argument or authority, it cannot be considered by this Court." *Liponis v. Bach*, 149 Idaho 372, 374, 234 P.3d 696, 698 (2010). In *Liponis*, we declined to reach certain issues on appeal because the appellant "failed to support them with either relevant argument and authority or coherent thought". *Id.*

As to the statute of limitations claim, Reed Taylor fails to identify how the district court erred and makes no argument. It seems that Reed Taylor is arguing that the statute of limitations bars Respondents from asserting that the Stock Redemption Agreement is illegal. Idaho Code §

---

[3] According to the Plan's calculations in its brief, Reed Taylor already received over $9 million pursuant to the Stock Redemption Agreement, including over $6.5 million in cash paid on the two notes.

5-237 requires "actions against directors or stockholders of a corporation to recover a penalty or forfeiture, or to enforce a liability by law" to be brought within three years "after the discovery by the aggrieved party of the facts upon which the penalty or forfeiture attached, or the liability was created," and I.C. § 5-224 requires that any "action for relief not hereinbefore provided for" be commenced within four years after the cause of action accrues. However, the statute of limitations does not apply to Respondents' defenses, such as the defense that the Stock Redemption Agreement is illegal. *Frank v. Davis*, 34 Idaho 678, 681, 203 P. 287, 288 (1921) ("The statute of limitations does not apply to defenses, but only where affirmative relief is sought."). As to Reed Taylor's claims concerning ignorance, innocence and knowledge, he appears to be suggesting that there were disputed issues of material fact concerning the justifiable ignorance exception to illegality that should have precluded granting summary judgment. However, this is only a guess, and Reed Taylor provides no argument or any citation to authority on this issue. As to whether the district court refused to address all of Reed Taylor's arguments and objections in "both motions" (presumably Respondents' motion for partial summary judgment and Reed Taylor's motion for reconsideration), Reed Taylor again provides no explanation or argument and merely cites to the district court's Opinion and Order granting partial summary judgment and Opinion and Order denying his motion for reconsideration. Therefore, we decline to consider these issues.

**D. We decline to instruct the district court to issue an order barring Respondents from asserting that AIA Services is insolvent.**

In addition to the earned surplus and capital surplus restrictions on a corporation's purchase of its own shares, I.C. § 30-1-6 provides: "No purchase or payment for its own shares shall be made at a time when the corporation is insolvent or when such purchase or payment would make it insolvent." Reed Taylor argues that Respondents failed to meet their burden of proving insolvency and that insolvency does not render a redemption agreement invalid. Therefore, Reed Taylor asks this Court to instruct the district court on remand to bar Respondents from asserting that AIA Services is insolvent.

"This Court is not empowered to issue purely advisory opinions." *MDS Invs., L.L.C. v. State*, 138 Idaho 456, 464–65, 65 P.3d 197, 205–06 (2003). The district court did not address the insolvency issue in the partial summary judgment which is the subject of this appeal. This opinion is based on the earned and capital surplus restrictions of I.C. § 30-1-6 and does not address the insolvency provision, and we decline to issue the requested order.

21

**E. We will not consider whether the district court erred when it refused to consider AIA Services' agreements to release Reed Taylor and AIA Services' obligations to indemnify him.**

Reed Taylor's argument on this issue reads in its entirety:

> In the absence of fraud, a release will be sustained. *Heath v. Utah Home Fire Ins. Co.*, 89 Idaho 490, 406 P.2d 341 (1965). On three different occasions AIA Services promised to indemnify and release Reed, specifically, on July 22, 1995, August 16, 1995, and on July 1, 1996. (Hr'g., Ex. B, p. 6 § 3; Ex. AC; Ex. Z, p. 11, §§ 6.1–6.2.) This bars a finding of illegality.

Reed Taylor's reliance on *Heath* is misplaced. In *Heath*, the plaintiffs (lessors) owned a home which they rented to tenants. 89 Idaho 490, 492, 406 P.2d 341, 341. After a severe hail storm, the lessors inspected the roof and exterior of the home while the tenants were on an extended vacation and the home was vacant. *Id.* The lessors notified the insurance company of damage to the exterior and prepared and executed a proof of loss. *Id.* A settlement was entered into and the lessors signed a release of "all claims and demands for the loss and damage under the policy." *Id.* at 493, 406 P.2d at 342. Subsequently, the tenants returned and discovered that the interior of the house had been extensively damaged by the storm. *Id.* After the plaintiffs submitted a supplemental claim for the repairs, the insurance company relied on the release in deciding to deny the claims. *Id.* The plaintiffs filed suit for recovery of the supplemental claim. *Id.* This Court held the release was not binding due to a mutual mistake "that the damage to the interior of the house was not known to, nor in the contemplation of, either party at the time of the release." *Id.* at 496, 406 P.2d at 344. Contrary to Reed Taylor's assertion that in the absence of fraud, a release will be sustained, the release in *Heath* was *not* sustained due to a mutual mistake.

Reed Taylor cites no other authority in support of his proposition that: "This" (presumably AIA Services' alleged promises to indemnify and release Reed Taylor) "bars a finding of illegality." Upon reviewing each release and indemnification agreement referenced by Reed Taylor, none of them appear to have any bearing on the issue of illegality of the Stock Redemption Agreement. Reed Taylor cites to the Restructure Agreement, which contains a release provision whereby Reed Taylor and the companies involved in the agreement agreed to release each other from all claims against each other arising out of previous agreements or business arrangements between them or arising out of Reed Taylor's ownership of or employment by AIA Services other than those obligations set forth in the Restructure

22

Agreement. Reed Taylor also cites the document whereby the officers and directors consented to the Stock Redemption Agreement, which states that Reed Taylor is:

> hereby fully and forever released, discharged and indemnified by the Company from all claims, causes of action, demands, rights, damages, costs, expenses, fees, compensation, liabilities and other obligations to the Company or any of its Subsidiaries of whatever kind . . . on account of or arising out of any agreement with or any act or omission by Mr. Taylor any time prior to the date hereof

except for obligations that arise under the Stock Redemption Agreement. And finally, Reed Taylor cites the Stock Redemption Agreement's indemnification provision, which states that each party:

> agrees to defend, indemnify and hold harmless the other party hereto . . . from and against and in respect of any and all costs, losses, claims, liabilities, fines, penalties, damages and expenses . . . incurred by an Indemnified Party in any action commenced by a third party in connection with or arising out of any breach or alleged breach of any representation, warranty or covenant made by the Indemnifying Party in this Agreement.

First, on the facts of this case, AIA Services can rely upon the illegality of the Stock Redemption Agreement, which has been raised by John Taylor and Connie Taylor, the minority shareholders at the time AIA Services entered into the Stock Redemption Agreement, as a defense to Reed Taylor's claims. The release and indemnification agreements all concern claims, fees, liabilities fines, etc. Second, an illegal contract is against public policy, and any release promising not to assert illegality is also against public policy and is void as a document in furtherance of the illegal contract.

**F. The district court did not err when it stayed general discovery, denied and refused to permit Reed Taylor to depose certain witnesses, refused to compel discovery of Respondents' expert witnesses and refused to exclude Respondents' belated expert witness testimony.**

First, Reed Taylor argues that the district court abused its discretion when it stayed general discovery in its Opinion and Order dated January 30, 2009. The district court entered the stay after Respondents' motion for partial summary judgment was noticed for hearing. The order stayed general discovery but allowed discovery to continue if it was "[r]elevant to [the] Motion for Partial Summary Judgment," including discovery related to the stock redemption agreement and the financial status of AIA Services in 1995 and 1996. On appeal, Reed Taylor baldly asserts that the district court unreasonably limited discovery, which prevented him from fully and fairly responding to Respondents' motions for partial summary judgment.

"Control of discovery is within the discretion of the trial court." *Jen-Rath Co. v. Kit Mfg. Co.*, 137 Idaho 330, 336, 48 P.3d 659, 665 (2002). Reed Taylor does reference the general proposition that discovery should not be stayed unless the entire action would be disposed of on the pending motion and that staying discovery is not favored by courts. In *Hovermale v. School Board of Hillsborough County, Florida*, the magistrate for the United States District Court explained:

> A magistrate has broad discretion to stay discovery pending the decision on a dispositive motion. It is an abuse of that discretion, however, to stay general discovery if plaintiff [has] been denied discovery which relates to the summary judgment motion. In addition, motions to stay discovery are not favored and are rarely appropriate where resolution of the dispositive motion may not dispose of the entire case.

128 F.R.D. 287, 289 (M.D.Fla. 1989) (citations and quotations omitted). In *Hovermale*, the Magistrate declined to stay discovery, finding that doing so would be overly broad since even if the court were to grant the defendants' motion for summary judgment, this may not dispose of the case. *Id.*

Reed Taylor has not made any argument on appeal as to how it was inappropriate to stay general discovery in this case and, therefore, how the district court abused its discretion. Given the complexity of this case, how much discovery had already taken place and given that the district court allowed discovery to proceed as to matters relevant to the motion for partial summary judgment, we cannot say that the district court acted without reason when it stayed general discovery pending the motion for partial summary judgment, especially since this motion for summary judgment could have been dispositive of the entire case. *See infra* Part III.H. Therefore, we hold that the district court did not abuse his discretion in staying general discovery.

Second, Reed Taylor argues that the district court erred and abused its discretion when it refused to hear certain motions to compel depositions and refused to permit him to depose individuals with knowledge of the Stock Redemption Agreement. The Affidavit of Roderick C. Bond (Reed Taylor's attorney) sets forth persons Reed Taylor sought to depose with some accompanying explanation as to each person. In its Opinion and Order dated June 17, 2009, which is the basis of this appeal, when considering Reed Taylor's motion for continuance, the district court explained that Reed Taylor "has provided the Court with no reasonable basis to believe additional discovery will produce new or relevant information not previously disclosed

and such discovery would only come at substantial additional costs to all parties with attendant delay in the pending proceedings."

"A trial court's decision to grant or deny a motion to compel will not be disturbed by this Court unless there has been a clear abuse of discretion." *Sirius LC v. Erickson*, 144 Idaho 38, 43, 156 P.3d 539, 544 (2007). Upon review of Bond's affidavit, we do not see how these depositions would have impacted the ultimate ruling that the Stock Redemption Agreement is illegal and unenforceable due to AIA Service's undisputed lack of earned surplus. Therefore, we hold that the district court did not commit a clear abuse of discretion.

Third, Reed Taylor argues that the district court abused its discretion when it "refused to hear and decide Reed's Motions to Compel and award sanctions." Reed Taylor cites to some of his motions in the record but provides no argument and cites no authority in support of this claim. Therefore, we decline to consider this issue. *See supra* Part III.C.

Fourth, Reed Taylor argues that the district court erred when it refused to grant his motion to require AIA Services' and CropUSA's directors to be ordered to produce corporate documents. "Control of discovery is within the discretion of the trial court." *Jen-Rath Co. v. Kit Mfg. Co.*, 137 Idaho 330, 336, 48 P.3d 659, 665 (2002). Reed Taylor has not demonstrated that the district court abused its discretion. In his Opening Brief, Reed Taylor fails to cite anything in the record, cite any authority, or provide any further argument on this issue. *See supra* Part III.C.

Fifth, Reed Taylor argues that the district court abused its discretion when it "refused to hear and decide issues of privilege and to compel the production of such documents, electronic data and information." Even though Reed Taylor sets forth, with citations to authority, various rules governing the waiver and disclosure of privileged information, and while he cites to numerous motions he made in the record, he provides no coherent argument and explanation on appeal as to how the district court abused its discretion. Therefore, we decline to consider the issue. *See supra* Part III.C.

Sixth, Reed Taylor argues that the district court erred when it denied his Motion to Compel Audit in its Opinion and Order dated August 2, 2007. In denying the motion, the district court explained:

> Plaintiff asks the Court to compel an audit of AIA Services and AIA Insurance but has presented . . . no authority that would allow the Court to enter such an order. Plaintiff instead relies on the rules regarding discovery and asserts from those that the Court has the inherent power to order an audit. The Court is

25

not persuaded by Plaintiff's argument nor is the Court aware of any authority that would allow it to order Defendants AIA Services and AIA Insurance to undergo an audit as a means of discovery. Plaintiff can, and has, made documentary discovery requests relative to the financial status of Defendants AIA Services and AIA Insurance. The Court finds that utilization of the discovery process should provide Plaintiff with significant information regarding the financial status of Defendants . . . and, therefore, finds an audit at this time to be overly intrusive and untimely.

There being no authority presented to the Court and the Court having found no authority that would allow for an audit to be ordered, the Court denies Plaintiff's motion to compel an audit. Nevertheless, the Court will allow Plaintiff to renew his motion if he is unable to obtain sufficient documentation through conventional discovery to fully evaluate the financial status of AIA Services and AIA Insurance.

The district court acknowledged that Reed Taylor could renew his motion to compel an audit if he was not able to fully evaluate AIA Services' financial status through conventional discovery. On appeal, Reed Taylor fails to argue what information regarding the financial situation of either corporation he has been unable to obtain that would have possibly affected the outcome of the partial summary judgment which is the subject of this appeal. Therefore, we hold that the district acted within its discretion.

## G. The district court did not abuse its discretion when it denied Reed Taylor's I.R.C.P. 6(b) and 56(f) motions, excluded his expert witness affidavit, and considered Respondents' expert affidavits.

First, Reed Taylor argues that the district court erred when it denied his I.R.C.P. 56(f) and 6(b) motions. Rule 56(f) provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Rule 6(b) provides that a party may request additional time to respond if good cause is shown. The decision to grant or deny a Rule 56(f) continuance is within the sound discretion of the trial court. *Carnell v. Barker Mgmt.*, 137 Idaho 322, 329, 48 P.3d 651, 658 (2002). On appeal, Reed Taylor asserts that the district court "abused its discretion when it [1] denied one of Reed's Rule 56(f) Motions, [2] refused to render a decision on another Rule 56(f) Motion, and [3] refused to hear the Rule 56(f) Motion until after [the] Motion for Partial Summary Judgment had already been heard."

26

The district court denied Reed Taylor's Rule 56(f) Motion in the Opinion and Order dated June 17, 2009, explaining:

Defendants' pending motion asserts the [Stock Redemption Agreement] was unlawful as it violated then existing statutory law. Plaintiff contends that before he can sufficiently defend against Defendants' assertion, he needs to conduct additional discovery. . . . The Court recognizes Defendants' motion brings into question the financial status of AIA as it existed in 1995. However, Defendants' motion was filed in April 2008, more than one year ago, during which time discovery has been ongoing. Plaintiff has failed to direct the Court to any particular information or document relevant to the 1995 financial status of AIA that has been denied to him through the discovery process. Plaintiff merely contends in general, without any specificity, that the Defendants are likely hiding information even though the record indicates Defendant AIA has provided Plaintiff with reasonable opportunity to inspect all 1995 and 1996 financial information still within the possession of AIA.

Plaintiff has failed to meet his burden as required by Rule 56(f). His request for a continuance in order to conduct additional discovery is based on mere speculation and on presumptions unsupported by fact or law, despite Plaintiff's voluminous filings. . . . Plaintiff has provided the Court with no reasonable basis to believe additional discovery will produce new or relevant information not previously disclosed and such discovery would only come at substantial cost to all parties with attendant delay in the proceedings.

We do not find that the district court abused his discretion. On appeal, Reed Taylor provides no argument and cites no authority as to why this denial constituted an abuse of discretion, and he does not argue against the district court's finding that he failed to point to any information or document that may be relevant to the motion for partial summary judgment. As to Reed Taylor's arguments that this motion was heard later than it should have been heard and that another motion was never heard, scheduling of court proceedings is within the discretion of the trial court. Furthermore, Reed Taylor fails to point to any information that might have been discovered that could change the outcome of the partial summary judgment, so he has not demonstrated that he suffered any prejudice. Pursuant to I.R.C.P. 61, entitled "Harmless error", courts are instructed to disregard error that does not affect the substantial rights of a party. *See Taylor v. McNichols*, 149 Idaho 826, 836, 243 P.3d 642, 652 (2010).

Second, Reed Taylor argues that the district court abused its discretion when it: (1) failed to state why certain paragraphs from the affidavit of his expert witness Pederson were excluded; and (2) excluded Pederson's Amended and Restated Affidavit as untimely. The admission or exclusion of expert witness testimony is reviewed for an abuse of discretion. *Cosgrove v. Merrell Dow Pharms., Inc.*, 117 Idaho 470, 473, 788 P.2d 1293, 1296 (1989). Reed Taylor filed

27

the affidavit of his expert witness Paul Pedersen (the Pedersen Affidavit) on February 26, 2009. In its Opinion and Order dated August 13, 2009, the district court clarified its ruling on the admissibility of the expert affidavits and set forth which paragraphs from the affidavits were admissible for purposes of this limited issue on summary judgment. The district court explained that it did not consider certain specified paragraphs of the Pedersen Affidavit because they were inadmissible or irrelevant. The district court explained that it *did* consider Pedersen's chart which set forth AIA Services' lack of earned surplus. Subsequently, Reed Taylor filed an Amended and Restated Affidavit of Paul Pedersen, which included the same chart showing AIA Services had no earned surplus at all relevant times. We find that the district court did not abuse its discretion. Furthermore, even if the district erred in refusing to consider certain portions of the Pedersen Affidavit, and in failing to admit the Amended and Restated Affidavit, Reed Taylor did not suffer any prejudice because both affidavits included the chart which shows that AIA Services had no earned surplus, which was the most relevant portion of the affidavits.

Third, Reed Taylor argues that the district court abused its discretion when it admitted and relied upon the testimony of Respondents' experts Voth and Hooper and failed to grant Reed Taylor's motion to exclude their testimony in full, because these experts were not timely disclosed, or ever disclosed, and Reed Taylor was not able to conduct discovery as to either expert or depose them. Respondents submitted these affidavits to address AIA Services' lack of earned surplus in 1995 and 1996. Again, Reed Taylor has not demonstrated that he suffered any prejudice, as the district court explained, "each of the accountants, including the Plaintiff's expert, found AIA had no earned surplus in the years 1995 and 1996, but instead had an earned deficit."

## H. We will not consider whether the district court erred in dismissing six of Reed Taylor's causes of action or whether Reed Taylor's remaining causes of action should be dismissed.

Upon finding the Stock Redemption Agreement to be illegal, the district court issued a Judgment dismissing six of Reed Taylor's causes of action (breaches of contract, misrepresentations/fraud, conversion, constructive trust, specific performance, breach of implied covenants of good faith and fair dealing). Reed Taylor asserts that the motion for partial summary judgment pertained only to the finding of illegality and claims that the district court abused its discretion in entering the Judgment dismissing six of his causes of action without

28

another hearing or motion. Reed Taylor provides no argument on this issue and cites no authority. Therefore, we will not consider this issue. *See supra* Part III.C.

On cross appeal, Respondents argue that we should dismiss the remaining five causes of action in Reed Taylor's Fifth Amended Complaint (fraudulent transfers/conveyances, alter ego, director liability, breach of fiduciary duty, and civil conspiracy). Reed Taylor argues that these causes of action exceed the scope of this Rule 54(b) appeal. We decline to consider whether Reed Taylor's remaining causes of action should be dismissed, because doing so goes beyond the scope of this appeal. *See Edwards v. Prime*, 602 F.3d 1276, 1288 (11th Cir. 2010) ("Appellate jurisdiction over an appeal from an interlocutory decision certified under Rule 54(b) is limited to the rulings or orders certified by the district court."). *See also Bowles v. Pro Indiviso, Inc.*, 132 Idaho 371, 376, 973 P.2d 142, 147 (1999) (explaining that an order denying summary judgment is not a final order and that an order denying a motion for summary judgment is not reviewable on appeal).

## I. No attorney fees on appeal are granted.

Respondents request attorney fees pursuant to I.C. § 12-120(3), I.A.R 40 and I.A.R. 41.

Idaho Code § 12-120(3) provides:

> In any civil action to recover on an open account, account stated, note, bill, negotiable instrument, guaranty, or contract relating to the purchase or sale of goods, wares, merchandise, or services and in any commercial transaction unless otherwise provided by law, the prevailing party shall be allowed a reasonable attorney's fee to be set by the court, to be taxed and collected as costs.

Reed Taylor filed this lawsuit to enforce the terms of a commercial transaction (the Stock Redemption Agreement); however, we have held that attorney fees under I.C. § 12-120(3) are not appropriate where the commercial transaction is illegal. We explained in *Trees*, 138 Idaho at 12–13, 56 P.3d at 774–75:

> While both parties' claims are based upon the commercial relationship between them, neither party should be permitted to claim the benefit of I.C. § 12-120(3). The commercial transaction was illegal. In *Kunz v. Lobo Lodge, Inc.*, 133 Idaho 608, 612, 990 P.2d 1219, 1223 (Ct. App. 1999), the Court of Appeals held the district court erred in awarding attorney fees under Idaho Code § 12-120(3) because the basis of the commercial transaction was illegal (the leases at issue were entered into knowingly and in direct contravention of a municipal criminal ordinance). The Court of Appeals, therefore, concluded the parties should be left where they were found. *Id.*; *Whitney*, 89 Idaho at 105, 403 P.2d at 579 (1965) (holding that if a contract is void as against public policy, then the court will refuse to enforce it and will leave the parties in the identical situation in which it

found them); *Nash v. Meyer*, 54 Idaho 283, 31 P.2d 273 (1934) (citing as fundamental the position that rights based on violation of law will never be enforced by the courts and that when a transaction is shown to be illegal because of contravention of a statute, a court is justified in its refusal to uphold the transaction in any way); *Libby v. Pelham*, 30 Idaho 614, 166 P. 575 (1917) (asserting the position that if a transaction is illegal because in contravention to a statute, it is sufficient to justify a refusal to uphold the transaction in any way, leaving the parties in the situation in which they have voluntarily placed themselves).

Therefore, Respondents are not awarded attorney fees pursuant to I.C. § 12-120(3).

Reed Taylor requests attorney fees and costs on appeal pursuant to I.C. §§ 12-120(3), 12-121, and 12-123. Because Reed Taylor is not the prevailing party, we do not grant this request.

The Plan requests attorney fees on appeal pursuant to I.C. § 12-121, I.A.R. 40, and I.A.R. 41. "Under I.C. § 12-121, attorney fees are awarded to the prevailing party only if the Court determines that the appeal was brought or defended frivolously, unreasonably, or without foundation." 148 Idaho 879, 884, 231 P.3d 524, 529 (2009). "Where a case involves a novel legal question, attorney fees should not be granted under I.C. § 12-121." *Campbell v. Kildew*, 141 Idaho 640, 651, 115 P.3d 731, 742 (2005). Since this Court has not previously addressed the shareholder vote provision of I.C. § 30-1-6, we decline to award attorney fees pursuant to I.C. § 12-121 to the Plan.

## IV. CONCLUSION

On the specific facts of this case, we affirm the district court in finding that the Stock Redemption Agreement violates the earned and capital surplus limitations in I.C. § 30-1-6 and is illegal and unenforceable. We affirm the district court in dismissing six of Reed Taylor's causes of action. Reed Taylor's other miscellaneous arguments on appeal fail. No attorney fees are awarded. Costs to Respondents.

Justices EISMANN, TROUT, Pro Tem, and HOSACK, Pro Tem, **CONCUR.**

J. JONES, Justice, specially concurring in the result of Part III.B.

I concur in the Court's opinion, but write separately to specially concur in the result reached in Part III.B. Based upon the public policy of former I.C. § 30-1-6, the overreaching of Reed Taylor, and the current financial situation of the parties under the contract, it is appropriate to hold the Stock Redemption Agreement to be void and unenforceable. This does not necessarily mean that any contract made in contravention of any corporate governance statute is automatically void and unenforceable. Each case should be decided on its own merits. The

30

Colorado Supreme Court provided a helpful framework for analysis in *Minnelusa Co. v. A.G. Andrikopoulos*, 929 P.2d 1321 (Colo. 1996):

> A minority of state appellate courts have held that stock repurchase agreements which violate statutory prohibitions are illegal and void, and refuse to enforce the obligations contained therein. *McGinley v. Massey*, 71 Md. App. 352, 525 A.2d 1076, 1078-80 (1987); *Field v. Haupert*, 58 Or. App. 117, 647 P.2d 952, 954 (1982); *American Heritage Inv. Corp. v. Illinois Nat'l Bank*, 68 Ill. App.3d 762, 25 Ill. Dec. 431, 436, 386 N.E.2d 905, 910 (1979). However, we find the following language in a case criticizing the minority view to be more enlightened:
>
>> The Court has not, in fact, adopted such a rigid rule that any contract made in violation of any statute is unenforceable. What it has done, although sometimes fleetingly, is to examine the statute at issue and the public policy behind it in an attempt to discern whether the legislature intended for contracts made in violation of the statute to be void or unenforceable. Other Maryland cases have more clearly expressed this notion.
>
> *Springlake Corp. v. Symmarron Ltd. Partnership*, 81 Md. App. 694, 569 A.2d 715, 718 (1990).

*Id.* at 1324.

I would suggest that the Court's opinion not be taken, without some caution, as precedent for the proposition that any contract made in contravention of any corporate governance statute will be held to be void and unenforceable. As indicated in *Minnelusa*, careful consideration must be devoted to the particular statute in question—to ensure that it embodies an important public policy—before a contract made in contravention of it is declared to be void and unenforceable. As the Court acknowledges in our opinion, the former I.C. § 30-1-6 served an important public policy function—to protect the interests of minority stockholders and creditors from the surreptitious depletion of a corporation's capital assets. The facts involved in this statutory violation are also compelling. The Stock Redemption Agreement was decidedly a self-interested one. Reed Taylor engineered a contract for his own benefit, acting as negotiator for the corporation, while at the same time acting on his own behalf as the other contracting party. This certainly heightens the public policy concern, making the transaction considerably more suspect. As to the current financial situation of the parties, Reed Taylor has given up control of his stock but, on the other hand, the respondents claim he has received over $9 million in cash, property, and debt forgiveness. Leaving the parties as they are does not adversely impact minority

shareholders or creditors. Thus, given the considerations of public policy, the facts of this case, and the present financial situation of the parties under the contract, it appears the interests of justice are served by leaving the parties where they currently are.

While the appropriate result was reached in this case, practitioners should be cautious in drawing any hard and fast conclusions as to whether any contract made in violation of a corporate governance statute will be automatically deemed void and unenforceable. First, the particular statute involved here embodied an important public policy. Second, the egregious facts support a holding that the transaction is violative of that public policy. Third, a somewhat less suspect transgression of a less critical corporate government statute may not obtain the same result. Fourth, the particular statute in question, I.C. § 3-1-6, has been repealed.